# FRANK SIACIK'S, Administrator, *vs.* THE NORTH-ERN CENTRAL RAILWAY CO.

*Death of Plaintiff in Action for Injury Caused by Negligence Pending an Appeal—Injury to Child Playing Under a Car Standing in a City Street—Legal Sufficiency of Evidence.*

Upon the death of the plaintiff pending an appeal in an action for injury to the person caused by negligence, the suit may be prosecuted by his administrator under *Code*, Art. 5, sec. 73, and Art. 75, sec. 25.

Plaintiff, a boy four years of age, together with two or three other children, was playing alongside of and under three or four freight cars, which had been standing for about an hour in the middle of a city street. When the cars were started, being moved by horses, the plaintiff, who was then under the rear car, was run over and injured. In an action to recover damages none of the witnesses heard any signal given or saw the horses or the men in charge of the cars before the accident. There was no evidence that the defendant's servants had knowledge or notice of plaintiff's perilous position or that it was customary to blow a horn before starting the cars. *Held*, that the defendant's servants were not bound to assume that there might be a child under one of the cars and to look there before starting, and that there was no legally sufficient evidence of any negligence on the part of the defendant to take the case to the jury.

Appeal from the Baltimore City Court (Ritchie, J.)

The cause was argued before McSherry, C. J., Fowler, Briscoe, Boyd, Pearce, Schmucker and Jones, JJ.

*Fielder C. Slingluff* and *Edwin Burgess* for the appellant.

*Charles H. Carter* (with whom was *John J. Donaldson* on the brief), for the appellee.

Boyd, J., delivered the opinion of the Court:

Frank Siacik, by his next friend, sued the railway company for injuries sustained by him by reason of the alleged negligence and want of care of the defendant's agents and servants. A suggestion of the death of the plaintiff and a petition to

substitute his administrator were filed in this Court and an order was passed to show cause, at the hearing, why the petition should not be granted. Section 25 of Art. 75 of the Code provides that "No action hereafter brought to recover damages for injuries to the person by negligence or default, shall abate by reason of the death of the plaintiff, but the personal representatives of the deceased may be substituted as plaintiff and prosecute the suit to final judgment and satisfaction." Sections, 73, etc., of Art. 5 of the Code, authorize the proper party to suggest the death of either party after an appeal has been prayed, or writ of error applied for, and to appear to such appeal or writ of error, for the purpose of prosecuting or defending the same. The appellee did not resist the application and, it being authorized by the statute, the administrator was substituted in the place of the original plaintiff and is now the appellant in this case.

At the trial in the Court below a prayer was granted, at the conclusion of the plaintiff's testimony, "That there is no legally sufficient evidence showing the injury complained of was caused by the negligence of the defendant, and therefore the verdict of the jury must be for the defendant." A verdict for the defendant was accordingly rendered, and from that action of the Court this appeal was taken. It becomes necessary, therefore, to examine the testimony in the record to ascertain whether there was legally sufficient evidence of the negligence of the defendant to justify or require its submission to the jury. Frank Siacik was four years and three months of age when the accident happened, which resulted in the loss of his right arm and left leg. The railway company has a track on Thames street, in the city of Baltimore, over which cars are hauled by horses. The plaintiff lived with his parents on the north side of Thames street (No. 1626), between Broadway and Bond street. Three or four cars of the defendant had been standing on the track for sometime—one witness said about a quarter or half hour and another over an hour. The rear car, looking westerly towards Bond street, was about opposite the residence of the plaintiff's parents. Four witnesses testified as to the

accident, three of them having seen the child about the time it happened. Mollie Surbush, who lived at 1624 Thames street, next door to the plaintiff, testified that she saw the cars standing there ; did not know how many, but about three or four; "the cars were standing there and the children were playing there ; our little boy, another one and this one (meaning the plaintiff), they were swinging on the wire under the car." She said her little girl, who was at the window, called her attention to the fact that the children were playing under the car and swinging themselves. She turned to look for a strap, to punish her child, when she heard a man on the wagon call out, "Hey ! Hey !" She then stepped to the window and saw the child run over.

John Polek was at work in a house on the south side of the street opposite the cars. He said the children were playing around the cars. "A few minutes after he heard the children and people hallowing, and then he heard the cars run, and right at the same moment he heard the people calling and saying a child had been hurt. The children had been hallowing and running one after the other." He did not see the child when it was run over. V. J. Shimek, was standing near the home of the plaintiff, talking with John Vavrina. He said there were "about two or three, or maybe four children, I seen playing there alongside the car, and some were swinging on the bars there, right on the car, swinging around and some playing alongside the cars." He said the bar was six or eight inches under the car and the plaintiff had both hands on the bar and swinging around it ; that the children had been playing there "about fifteen or twenty minutes, something like that." Vavrina said the plaintiff was at the rear end of the car hanging on to the bar of iron. His testimony was in substance the same as that of Shimek. None of the witnesses heard any signals given or saw the horses or the men in charge of the cars until after the accident, and no explanation was given as to where the horses were before the accident, or whether they were hitched to the cars. Mollie Surbush said: "I saw the horses after the child was run over and they took the horses

from one side to the north side in front on the car and hooked them in front of the car and took the cars away." They did not even say how many men connected with the company were there, but they spoke in the plural—speaking of "men" or "drivers," although Mrs. Surbush spoke in one place of "the drivers," while she, in the same connection, used the expression "he said," in giving a conversation with her husband after the accident. It is, therefore, difficult to tell from the record whether there were more than one, but it is probable there were a driver and a brakeman. The cars were being moved westerly, towards Bond street, and the rear car stood in front of the plaintiff's home, which was about the middle of the block. There was no obstruction on the track east of the rear car and there was only one wagon passing along the street about the time of the accident. There was no testimony as to whether it was customary to blow a horn or give a signal before starting cars which had been standing on the street.

It must, of course, be conceded, that generally the question of negligence must be left to the determination of the jury when there is any legally sufficient evidence of it. But to entitle the plaintiff to recover in actions of this character, some negligence must be shown on the part of the defendant, which directly contributed to the injury complained of. As we have frequently said, unless there is such evidence as will fairly support a verdict for the plaintiff, it is the duty of the Court, on being requested to do so, to instruct the jury to find for the defendant, as otherwise verdicts of juries would be founded on mere conjecture and speculation, which the law does not permit. Taking all the evidence into consideration, which we must do, does that in the record show that the defendant either did any act which it ought not to have done or failed to do what it ought to have done? If its servants knew that the child was swinging on the bar under the car, then unquestionably they ought not to have started the cars while he was in that perilous position, but there is not a particle of evidence to prove that knowledge or anything from which it can be inferred. As the three witnesses who saw the child when he

was injured were on the north side and testified they did not see any servants of the defendant, any that were there, were probably on the south side of the cars.   If they were, it is not likely they could have seen the plaintiff swinging under the north side of the car, and hence could not have known that he occupied such a dangerous position.  But the witnesses did not give the jury the least information as to where they were, or what they were doing, excepting that they came from the south side to the north side after the accident.   They all said they saw no one on top of the cars, and in the absence of some proof to the contrary, it must be presumed that the driver was about his horses, and, if the horses were pulling the cars, they must have been towards the front.

But it is said that the defendant's servants were negligent in not giving some signal before starting.   There is no evidence from which it can be inferred that this child was misled by there not having been some notice given of the intention to move the cars.   If a horn had been blown it would have been for the purpose of notifying persons in front of the cars of their approach, but there is not only nothing to show that it was customary to do so but no occasion shown for it, in this instance.   Surely they were under no obligation to assume that there might be a child swinging on a bar under the car and, therefore, ought to have gone to the rear, and on the other side of the cars, to look for a child in that position.  If a driver of a heavy wagon had occasion to stop his wagon in the street for a half hour, or an hour, and a child without his knowledge got under the wagon and was run over, could negligence be imputed to him for not first examining to see if a child had gotten there before starting?   Or, if a street car is delayed on the street for that length of time, would it be incumbent on those in charge of it to look under the car to see whether a child was there, unless there was something to show that they had cause to believe that such might be the case ? And why should a driver of a team, hauling cars, such as these, have any reason to suppose that a child was playing under one of the cars ?

*McMahon's case*, 39 Md. 438, so much relied on by the appellant, presents some very different facts from those now before us. There Canal street had been blocked by the cars of the railway company from Fawn to Bank street for nearly five hours—the cars had been standing there from five or six o'clock in the morning until ten. McMahon's mother had sent him on an errand from the side of the street on which she lived to the opposite side and, seeing that the street was blocked, told him to go to Gough street to cross. On his return he was run over by the cars, which started suddenly. None of the witnesses knew "when or how he got under the cars—whether he attempted to pass between them before they started, or under them while in motion." The brakeman was walking leisurely beside the train when the accident happened and called several times to the driver to stop, but the latter did not seem to hear him and it was some time before the cars were stopped. It was an unreasonable use of the street to block a whole square for nearly five hours. The public was entitled to the use of it as well as the railway company. The boy had a right to cross the street and inasmuch as it had been thus obstructed for such a great length of time the railway company's servants might, in the opinion of the jury, have had reason to believe that persons going from one side of the street to the other would attempt to do so by going between the cars or under one of them. Children especially might adopt the latter course. This Court said, in reference to a prayer such as the one now before us, "whether ordinary care on the part of the defendant, having a prudent and considerate regard for the safety of others, entitled to the use of the street, required that a signal or warning of some kind should be given in moving a freight train, extending nearly a whole square, and which had been standing on the track for more than four hours, or whether the brakeman was in the proper place to stop the cars by the use of the brakes, should it become necessary to do so ; or whether under all the circumstances the defendant exercised the care and prudence which might reasonably be expected, were questions for the jury to decide."

McMahon was entitled to the use of the street in going from one side to another, and when the defendant had blocked the square for over four hours its servants might have known from experience and ordinary observation of the blockading of streets by railway cars that some people would likely climb over, between, or, if small enough, under the cars in order to cross the street. Whether such an act would be contributory negligence would depend upon circumstances, and we are not now concerned about that, but whether, with such knowledge on the part of the employees as we have stated above, or such as could be imputed to them, it was negligence on their part in moving a freight train of such length, which had not been moved for over four hours, without first giving some warning, so that those lawfully using the streets and crossing from one side to the other would not attempt to cross between or under the cars, was not so clear and certain as to enable the Court to determine it as a matter of law. Then if the brakeman had been in the proper place to stop the cars by the use of the brake, instead of calling to the driver to stop, he might have avoided the accident. The evidence showed where he was, and therefore the jury could pass on the question as to whether he was in the proper place, and whether his absence from the proper place, if the jury so found, was negligence directly contributing to the injury. The McMahon boy was five years and nine months old and "of unusual intelligence." A warning that they were about to start would have been of more use to him than to a child of four years and three months of age who was swinging under a car.

This unfortunate child was not attempting to cross the street and no one could have had any occasion to climb over or under the cars in doing so. He was at the rear end of the last car and the rest of the street was unobstructed. There is nothing from which it could be inferred that the servants of the company knew or had any reason to suspect that a child was or might be amusing himself by swinging under the edge of a car. Nor can there be any reasonable inference that the

failure to blow a horn, or give such signals as might properly be given in a street of a city, in any way misled the child or contributed to its injury. There is certainly no evidence to even suggest the necessity of the servants of the company looking under the car to see if a child was there, and if they be held to such strict diligence as to require them to look on both sides of the three or four cars before moving them to see whether any one, child or adult, was near enough to be injured, there is no evidence that they did not do so. If they had done so, they could not well have seen this child unless they had gone back to that car and made a search under it which surely could not have been required of them. It is true that the three witnesses on the north side of the street said they did not see any one, but they did not see the horses, and if they were pulling the cars they certainly could have been seen, if the witnesses had looked in the direction they were. Even if the employees of the defendant heard children playing in the neighborhood they could not be charged with notice that one of them was or might be under a car or near enough to be injured by it, without more evidence than we have before us.

Then, as we have seen, there is nothing whatever to show that the servants of the company were not in their proper places, for there is no evidence where they were. If the horses were moving, the driver's place was where he could control them, and he may have been there. In the absence of anything to the contrary, the presumption is that he was where he ought to have been, as we cannot assume he was not discharging his duties properly. If there was a brakeman, he may have been at or about the brake where he could be of most service in the protection of the public lawfully using the street. But we are utterly without information as to where either of them was. If Shimek's statement is correct, whoever was or were in charge of the cars must have been where he or they could speedily stop them, if necessary, for this is his testimony on the subject. " Q. After the cars started how long was it before it ran over the child? A. It was about

one minute ; that's all.   Q.  Do you use the word ' minute ' to indicate the length of a minute, or simply use it—.   A.  The cars moved, and then they stopped right away ; " and Polek's evidence was to the same effect.

The fact that the child was injured does not furnish any presumption of negligence on the part of the defendant's agents, and it would have been impossible for the jury to have found for the plaintiff *on the evidence* before them or any proper deductions therefrom.   To have found that the defendant's agents were negligent would have been mere conjecture and speculation.   As was said in *McMahon's case*, " No absolute rule in regard to negligence can be laid down to cover all cases.   What would be ordinary care in one case, might be negligence in another, the relative degree of care or want of it depending upon the circumstances of each particular case."  The general principles of law applicable to actions for injuries resulting from negligence are so well established and cases of that character are so numerous, that they now seldom present any difficulty in determining what the law is, but, as the facts do differ, the application of well-established principles of law must vary according to the facts.   Those in *McMahon's case* are certainly more similar 'to those before us than any other we have been referred to, but even in that the evidence of negligence was very meager, although the Court thought it sufficient to justify its submission to the jury.   Here, however, we do not find any evidence from which the jury could properly have found or inferred negligence on the part of the defendant and the judgment must be affirmed.

*Judgment affirmed, the appellant to pay costs.*

(Decided January 16, 1901.)