THE BALTIMORE AND OHIO RAILROAD COMPANY *vs.*
STATE OF MARYLAND, use of GRACE M. ALLISON,
by her next friend, CATHARINE BEETZ.

*Appeal—Amendment of Pleadings under sec. 23, of Art. 75,
of the Code—Hearsay Evidence—Exclusive right of Way
of Railroad Company—Trespasser on Right of Way of
Railroad Company—Action against Railroad Company to
recover damages for Killing a man—Violation of City Ordi-
dance as affecting the question of Negligence.*

An appeal will not be dismissed upon the ground that the record of
the case was not transmitted within the time required, if it shall
appear that the delay in the transmission was occasioned through
the fault of the clerk, and not through any fault of the appellant.

An action was brought against a railroad company to recover dam-
ages for the death of the father of the equitable plaintiff by the
alleged negligence of the defendant's employés. The suit was
brought by titling, in the name of the State, use of G. M. A., by
her next friend, C. B. When the declaration came to be filed, in
the titling thereto and in the commencement thereof, the name of
the State was omitted. On motion, leave was given to amend the
titling of the declaration, and the declaration itself by the inser-
tion in each, of the words " The State of Maryland for the use of,"
before the name of the equitable plaintiff. On appeal, it was HELD :

That the granting of the motion did no more than make the declara-
tion conform to the original titling and the summons which issued
in pursuance of it, and was entirely justified by section 23, of Arti-
cle 75, of the Code, and the uniform practice which has obtained
thereunder.

At the trial, a switch-tender whose post was near the place where the
accident occurred, was asked by the plaintiff " what was the com-
munication made to you by the engineer D. when he came back, as
to how the man was killed ? " On objection it was HELD :

That the question, and the answer thereto to the effect that the engi-
neer had said that " he had pulled the whole train over him," were
inadmissible, the evidence being hearsay.

Balt. & Ohio Railroad Co. *vs.* State, use of Allison.

The right of way of a railroad company is the exclusive property of such company, upon which no unauthorized person has a right to be; and any one who travels upon such right of way as a foot-way, and not for any business with the railroad, is a wrong-doer and a trespasser; and the mere acquiescence of the railroad company in such user, does not give a right of way over the track, or create any obligation for special protection.

Where a person trespassing upon such right of way was run over by a train of cars and killed; and the place where the accident occurred, though within the corporate limits of the City of Baltimore, was not upon any street or public way where the person killed had a right to be, it was HELD:

That in the absence of other acts of negligence on the part of the agents of the railroad company, the non-compliance with a city ordinance requiring that " when a locomotive engine is used within the limits of the city, a man shall be required to ride on the front of the locomotive engine when going forward, and when going backward, on the tender, not more than twelve inches from the bed of the road," did not *per se* amount to such omission of a general and imperative duty toward the deceased, as would render the company liable in an action for damages resulting from his death.

APPEAL from the Circuit Court for Baltimore County.

This case was instituted in the Superior Court of Baltimore City, whence it was removed to the Circuit Court for Howard County, and thence to the Circuit Court for Baltimore County, where it was tried. The nature of the case, and of the exceptions taken, are sufficiently set forth in the opinion of the Court. It is proper, however, to state in addition, that the amendment to the *narr.* and its titling, the granting of which by the Court formed the subject of the first exception, was the insertion of the words: "The State of Maryland for the use of" before the words "Grace M. Allison," in the commencement of the *narr.* and in the titling of the *narr.* There was a verdict and judgment for the plaintiff for $5,000. The defendant appealed.

The cause was argued before ALVEY, C. J., ROBINSON, IRVING, RITCHIE, and BRYAN, J.

*John K. Cowen,* for the appellant.

*B. R. Boarman,* and *John I. Yellott,* for the appellee.

IRVING, J., delivered the opinion of the Court.

The motion to dismiss this appeal must be overruled. It is apparent from the proofs submitted that the delay in the transmission of the record, was not occasioned by any fault of the appellant, but was the fault of the clerk, who so admits on oath.

On the night of the 9th of July, 1881, William J. Allison, the father of the equitable plaintiff, is alleged to have been killed by a train of the appellant's railroad cars passing over him; and this suit is brought in the name of the State, for the use of his only child, to recover damages for the death of the father, by the negligence of the defendant's employés.

The first exception is to the allowance of an amendment to the plaintiff's *narr.* and titling to it. The theory of the exception is that an entirely new party has been admitted contrary to the provisions of section 29 of Article 75 of the Code. But this is a clear misapprehension. By examining the record we find the suit was brought by titling in the name of the State, use of Grace M. Allison, by her next friend Catherine Beetz. When the declaration came to be filed, in the titling thereto, and in the commencement thereof the name of the State was omitted, and the leave asked was not to amend the titling to the suit, but that of the declaration itself, and the declaration also. The granting of this motion allowed the plaintiff to do no more than make the declaration conform to the original titling, and the summons which issued in pursuance of it, and was entirely justified by the 23rd section of Article 75 of the Code and the uniform practice which has obtained thereunder. There was therefore no error in that regard.

The second bill of exception presents a question of the admissibility of a certain statement of the engineer, alleged to have been made to the switchman immediately after the accident. Procter, the witness, was flagman and switch tender for the appellant at the time of the accident, at the watch box on the appellant's road where it curves off from the main road and runs down across Fort Avenue to the appellant's coal hopper yard. This witness said it was the engineer's business to inform him of any obstructions that might be on the track, so that he might hold the following train till the obstruction was removed. He stated that the engineer told him there was a man killed down on the track. To this no objection was made, it being conceded to be within the line of the engineer's duty to state that much. The plaintiff then asked "what was the communication made to you by the engineer Davis when he came back, as to how the man was killed?" Objection was made to this question, but it was overruled, and exception was taken. The statement made and allowed was, that in response to a question from the witness, "what kind of looking man he was," he responded, described the man, and said "he had pulled the whole train over him." We are at a loss to perceive upon what principle this question and answer can be admitted. The fact that there was a man killed on the track was all that the watchman need know for the discharge of his duty in preventing another train from going down the track. How it was done was immaterial so far as his duty was concerned, and as proof in the cause, nothing that the engineer stated to the witness, beyond the fact that there was a man killed and on the track, ought to have been admitted; for it was clearly hearsay. How it was done, the Court recognized as inadmissible and refused to let the witness proceed with any further detail. We cannot see why what he did say was less objectionable than further particularity in respect to the matter. It was not offered to impeach

the engineer, whose testimony was not then in, as a contradictory statement; and it was error to permit the witness to say more than that Davis told him a man had been killed and was still on the track. It is so clearly obnoxious to the objection of being hearsay, that we need not cite authority in support of this ruling.

The third exception is to the refusal of the Court to take the case from the jury by granting the defendant's prayer to that effect offered at the close of the plaintiff's testimony. As this prayer was renewed after the defendant's testimony was all in, and was again refused, and exception was taken to that refusal and the granting of certain instructions on the behalf of the plaintiff as well as the rejection of others on the part of the defendant, all which is presented by the fourth exception, we shall consider that question in the light of the whole case as presented by the proof embodied in all the exceptions.

The main facts which need recital are undisputed or uncontradicted. At a point in the City of Baltimore, where the appellant's road forks, and one track, called the New York cut off, goes on to the ferry, and the other track curves off and runs down to the appellant's coal hopper yards, there is a watch box, where the defendant keeps a watchman or a switch tender. From this point, to the hopper yards of the appellant, the appellant's road runs on its own private property, condemned and purchased for the purposes of its road. Although it passes through the city, that portion of the road where the accident occurred passed through an uninhabited and unbuilt up portion of the city, where there are and were no streets, opened and used as such. Streets are laid down on Poppleton's plat, to be opened whenever the needs of the city require it because of expansion in that direction; but as yet it is uninhabited, and no streets have been condemned or opened. Fort Avenue is a public highway and quite a travelled thoroughfare. This track crosses Fort Avenue in its route

to the hopper yards, about four hundred and fifty yards from the watch box on Wills street. The accident happened about three hundred yards from Fort Avenue and about one hundred and fifty yards from the watch box. From the watch box the hopper tracks curve off to the left from the main road, and the track runs upon a "high fill," fifteen or twenty feet high through a swamp called the "Devil's bucket," into which the road bed slopes steeply on each side. This embankment extends nearly to Fort Avenue. Persons can walk along the side of the track, but cannot ride or drive along it. Some people use it in the day time as a pathway down to Fort Avenue; but it was never so used at night. Although the track is laid on this high fill the road is down grade toward Fort Avenue.

At the point where the accident occurred no street is projected for the future even. There are two hopper tracks; and before reaching Fort Avenue, the engine was usually switched off, and running back on the other track to the watch box, got on the other track again to push the cars to the hopper yard. About twenty-five minutes past 1 o'clock a. m. on this occasion the appellant's engine, with tender and twelve loaded coal cars, passed the watch box, and went down toward Fort Avenue. The train went down on the south track, and the engine came back in from three to five minutes, on the other track, and then the engineer informed the watchman that a man was killed on the track. The train was moving two, three, or four miles an hour. No bell seems to have been rung in passing the watch box, but the head light was burning all right. How the deceased came to be there, or when he came, no one could tell. A drunken man had been seen an hour or more before down the track going in that direction, and toward the watch box. Although shown to be ordinarily sober and opposed to drinking, even to total abstinence, there was uncontradicted evidence from two persons that

Balt. & Ohio Railroad Co. *vs.* State, use of Allison.

he was drunk that night, and left a drinking house with a flask of liquor, and there was proof that the smell of liquor was plain three feet off before reaching his body. He was nearly a mile away from his boarding house without any explanation of it. There were no habitations any where near by. Though within the city limits, there were no streets nor lights from the watch box to Fort Avenue. The place was dark and lonely, and the ground uneven and rough. It would seem as if the man was lying on the track at the moment of the accident, either drunk or asleep, or sick, or *possibly* already dead; for the fireman, who was on the look-out, saw something, as he thought, and said to the engineer, who was also on the lookout, "Si what's that? is it a hog?" and in the same breath and before the engineer had time to do anything, though he had his hand on the throttle, the fireman said "No it is nothing, go ahead." The engineer saw nothing, and made no effort to stop and did not stop, but kept on till the engine was cut loose and came back on the other track. When he got opposite the rear end of the train he was told, by the conductor, they had run over a man. They had felt no jar, as having passed over anything, and had heard nothing.

Upon this state of facts the appellee wholly relied for recovery upon alleged violations of the following ordinance of the city which was put in evidence: " When a locomotive engine is used within the limits of the city, a man shall be required to ride on the front of the locomotive engine when going forward, and when going backward, on the tender, not more than twelve inches from the bed of the road; nor shall any locomotive be propelled at a greater speed than five miles per hour except where there are grades requiring greater speed, and then it shall not exceed six miles per hour; and the person or persons having charge of such locomotive engine shall ring a bell when approaching any and every cross street, and no steam

whistle attached to any locomotive engine shall be used within the limits of the city, except at the Mount Clare and Camden stations, and between said stations and the city limits; for any violation of the conditions herein set forth, the company so violating shall forfeit and pay the sum of ten dollars for each and every offence."

It is claimed on the part of the appellee that this ordinance was violated in not having a person to ride in front of the engine within twelve inches of the ground to look out and prevent accidents. It has also been shown that there was no bell rung, but as the ordinance only requires that to be done at the approach of street crossings, and there were no cross streets where this accident occurred, and they were not near enough to Fort Avenue to require the bell-ringing to be begun for it, that can hardly be pressed as a sufficient omission to be of itself a cause of action in this case. Indeed it was not seriously insisted that it was.

To avail themselves of the confessed omission to do what the ordinance required of the Rail Road Company in respect to the look-out, in passing through the city, the appellee's counsel argued, that notwithstanding this was the private right of way of the appellant, yet there was a path along the track, and people were in the habit of using it for the purpose of passing down to and from Fort Avenue, and beyond, so that it had become such a thoroughfare that the company in the use of its right of way for its engines and cars were under obligation to use it with special reference to this user by the public, and to exercise special caution in passing over the road to avoid injuring any one happening to be on the track.

In reply, the appellant contends, that from the mere permissive user of the path by the side of the track, the public has acquired no right to use it, and where there is no right there can be no obligation beyond that which ordinarily attaches to the use of engines and trains upon

the appellant's private property; and this would seem to be accepted law by the large weight of authority. The mere user of such a path for foot passage, without objection on the part of the company, cannot be construed into an invitation to so use it, and the use of such a perilous way of travel in the day time could hardly justify an expectation that any body could be so foolhardy as to attempt it at night, at which time the evidence is it was never used in that way.

A right of way of a railroad company is the exclusive property of such company, upon which no unauthorized person has the right to be, and any one who travels upon such right of way, as a footway, and not for any business with the railroad, is a wrong-doer and a trespasser; and the mere acquiescence of the railroad company in such user does not give the right to use it, or create any obligation for especial protection. *Illinois Central R. R. Co. vs. Godfrey*, 71 *Ill.*, 500. Whenever persons undertake to use the railroad in such case as a footway, they are supposed to do so with a full understanding of its dangers, and as assuming the risk of all its perils. 71 *Ill.*, 500; *M'Laren vs. Indianapolis & Vincennes R. R. Co.*, 8 *American and English Railroad Cases*, 219; *The Jeffersonville, Madison & Indianapolis R. R. Co. vs. Goldsmith*, 47 *Indiana*, 43; *Railroad Co. vs. Houston*, 95 *U. S.*, 702, and *Railroad Co. vs. Jones*, 95 *U. S.*, 442; 1 *Thompson on Negligence*, 453, 459; *Morrissey vs. Eastern Railroad Co.*, 126 *Mass.*, 377. In *Maenner vs. Carroll, et al.*, 46 *Md.*, 212, which was a suit for injury received by falling into an excavation which had been dug on the private property of the defendant, over which persons were in the habit of passing, but which was not a public highway, this Court declared the same principle as controlling, and adopted the language of the Court in *Hounsell vs. Smyth*, 7 *C. B. N. S.*, 731, that in such case, "one who uses the waste has no right to complain of an excavation he finds there. He

must take the permission with its concomitant conditions, and, it may be, perils." *Binks, Adm'r, vs. South Yorkshire Railway & River Dun Co.,* 3 *B. & S.,* 244; *Bolch vs. Smith,* 7 *H. & N.,* 736, and *Gautiel, Adm'r vs. Egerton, et al., L. R.,* 2 *C. P.,* 371, are cited in support of the law thus endorsed.

Inasmuch, therefore, as the presence of the deceased upon the road of the appellant at that point was a trespass, it would seem to be necessary to show some negligence, amounting to the omission of a general and imperative duty toward him notwithstanding, which ought to subject the appellant to liability in the action brought. This the appellees think they find in the violation of the city ordinance with respect to the step and look-outs provided for in it. To this appellant makes several replies; first, that there is an entire failure of proof to show that this omission tended in the slightest degree to bring about the fatal accident; or that its observance would have tended to prevent it; secondly, that the fact of the deceased being in so perilous a place, without any assignable reason, and that too as a trespasser at a most unreasonable hour, was such patently contributory negligence as entitled the case to be taken from the jury; and lastly, that the ordinance is so manifestly unreasonable, that it cannot be complied with as engines are now constructed; the engine then used by the appellant being such, as is now generally in use, and as the step did not exist and could not be placed, and a person could not sit, where the ordinance provided, without imminent danger to life, the ordinance must be held inapplicable and void.

We are clearly of opinion that this case ought not to have been submitted to the jury. How the accident occurred and why, is shrouded in as much mystery as it was in *Northern Central Railway vs. State, use of Burns,* 54 *Md.,* 113, and *State, use of Barnard, et al. vs. Phil., Wilm. & Balto. R. R. Co.,* 60 *Md.,* 555; and to hold the

appellant liable under the *circumstances of this case,* simply because of the ordinance in question and the alleged violation thereof, in having no step in front of the engine within twelve inches of the ground, and in having no man there to look out and guard against accidents, would be giving an unreasonable interpretation and operation to the ordinance in question. We do not find it necessary to consider or pass upon the question whether the ordinance has served its purpose, having been passed at a period when engines of different pattern were made and used, which have been superseded by others of such character that the ordinance cannot be complied with without endangering, instead of protecting human life, and is consequently to be pronounced void because it is unreasonable. The question was very ably argued and involves principles of great moment which we do not think ought to be decided without more proof bearing on the subject than we have in this case. We have no difficulty, however, in holding that the provisions of that ordinance ought not to be applied to a case circumstanced as this is, and to a locality such as that, where this road runs and the accident occurred, confessedly is. The ordinance was intended for the protection of the people in the city who were compelled to pass along and cross streets where railroad cars were passing. It provides for the ringing of bells at the cross streets. It contemplated, and was passed with reference to, a condition of things which did not exist here. It presupposed that where the city was built up and populous, the passing and repassing would be so considerable as to require protection to life by means of such an ordinance. Although the *locus in quo,* where this accident occurred, was technically within the corporate limits of the city, practically it was outside, as much so as the country adjoining the corporate limits, and perhaps more so, than most of the adjacent territory. It has already been described. It was not treated as part

of the city by its authorities. It had no streets. It was uninhabited and desolate. It was swampy and uneven. It was not lighted nor patrolled. And there was no need for either lights or watchmen. The railroad was running on its own private property crossing none of the city's streets at that point. Nobody was entitled of right to pass that way, and could not be expected to be passing at such an hour of the night. There being no reason or necessity, for observing such precautions as those prescribed by the ordinance, in such a place, it would be giving it a most unreasonable construction, and unnatural application to hold, that an omission to observe its requirements, at such time and place, *per se,* and standing on that alone, gave a right of action to the appellee. This view is entirely sustained by authority and we refer to 1 *Dillon on Municipal Corporations, section* 319, *and Myers vs. Chicago, Rock Island and Pacific Railroad Company,* 57 *Iowa,* 556, and authorities there cited. The facts bearing upon the ordinance and controlling the decision in *Myers' Case,* 57 *Iowa* are very similar to this case. Independent of the ordinance the case falls within the principles and ruling in *Burns' Case* and *Bernard's Case* already cited, and as we think the ordinance cannot be invoked to compel a verdict for the plaintiff, it is clear the prayer at the close of the case taking the case from the jury ought to have been granted. We are accordingly relieved from considering the other instructions.

*Judgment reversed.*

(Decided 2nd July, 1884.)