# LEO M. CHENOWETH

## vs.

# HARRY L. HOEY ET AL.

*Prayers—Necessity of Reference to Pleadings—Court Sitting as Jury—Appeal—Contract for Sale of Good Will.*

Unless prayers make special reference to the pleadings, they will be held to relate exclusively to the evidence, and their correctness will be determined entirely by a consideration of the evidence.                                                             p. 99

When a case is tried by the court without a jury, the same rule is applicable as if tried before a jury.                     p. 99

In passing on prayers to take a case from the jury for want of evidence, the court cannot consider the weight of the evidence, but only whether there was any legally sufficient evidence to be submitted.                                                     p. 99

On appeals from judgments in cases tried by the court sitting as a jury, it is immaterial whether the Court of Appeals agrees with the conclusion reached by the lower court in passing on the facts submitted to it; the only question being whether the evidence was legally sufficient to be submitted.                 p. 100

While goodwill will not be protected from the competition of a rival, and the mere fact that a brother of the seller is interfering does not necessarily mean that there has been a violation of a contract not to re-engage in the same business, yet if the business is carried on under another name, or by another person, or the name of such other is used as a mere cover or blind to conceal the interest of the seller, relief will be granted, provided it clearly appears that the seller is connected with the competing concern and aggressively acting with it or for it to the injury of the purchaser.                                         p. 104

*Decided November 13th, 1919.*

Appeal from the Baltimore City Court (DUFFY, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE, and ADKINS, JJ.

*Willis E. Myers,* for the apppellant.

*John B. Gontrum,* with whom was *John S. Biddison* on the brief, for the appellees.

BOYD, C. J., delivered the opinion of the Court.

On the 29th day of March, 1918, the appellant agreed to sell to the appellees "his business, good-will and fixtures of the store known as No. 1401 Laurens street, one Ford truck and two one-horse wagons" for the sum of $2,000.00, of which $500 was paid on that date and the balance was to be paid by the 10th of April. The appellees also agreed to lease the store, cellar and yard at $30.00 per month, beginning on April 1st, and also stall No. 964 in Lexington Market at $15.00 a month for the term of five years. It was further agreed that the appellees would "pay the inventory value of the stock as taken on April 1st, 1918," and the appellant was to account to them for all business done after April 1st, 1918, with the understanding that he was to be afforded facility for collecting the outstanding indebtedness due him up to and including March 31st, 1918.

On the 9th day of April, 1918, another agreement was made, in which the former one was referred to, and it was stated that the appellant, in consideration of $2,000 "hereby bargains and sells to the said parties of the second part (the appellees) all his business, good-will and fixtures of the store known as No. 1401 Laurens street, Baltimore City, and of the stall No. 964 Lexington Market, Baltimore, one Ford truck and two one-horse wagons." No special reference is there made to the stock or to the leases. There is a provision in it as follows: "And in consideration of the said sum of two thousand dollars the said party of the first part (appellant) hereby agrees that he will not engage in the retail butter and eggs business within the City of Baltimore either

directly or indirectly either as an individual or under the name of the Chenoweth Butter Company, or as an agent or member of any firm or corporation, for a period of five years dating from March 29, 1918." The case was tried before the Court, sitting as a jury. There are three exceptions in the record—the first and second relating to evidence admitted, and the third presenting the ruling on a prayer, but the first and second were abandoned, and hence will not be discussed by us. The prayer offered by the appellant and refused by the Court asked for an instruction "that there is not legally sufficient evidence to entitle the plaintiffs to recover in this case, and the verdict must be for the defendant."

The appellant contends that the only possible dispute that could have been made was whether or not there was a delivery of certain butter and egg routes referred to in the evidence, and that the uncontradicted evidence shows that there was such a delivery as those routes were capable of—there being no denial that the tangible property was delivered in accordance with the contract. The case, however, involves more than the mere question whether there was a constructive delivery of those routes. The declaration alleges "that part of the said business of the store known as No. 1401 Laurens street consisted of butter and egg routes; that the defendant has failed to give up and deliver the said routes and the good-will thereof to the plaintiffs," but the only question before us is presented by the exception to the ruling of the Court in rejecting the prayer of the defendant which is set out above. No reference to the pleadings is made therein, and "unless special reference is made to the pleadings, prayers will be held to relate exclusively to the evidence, and their correctness will be determined entirely by a consideration of the evidence." *Poe on Pl. & Pr.*, Sec. 302. It is unnecessary to cite authorities to show that when a case is tried before the Court, without a jury, the same rule is applicable as would be if it was being tried before a jury, or that in passing on such a prayer as this the Court cannot consider the weight of the evidence, but only whether there is any legally sufficient evi-

dence to be submitted to the jury, or to the Court, sitting as a jury. Such questions are too thoroughly settled to require citation of the decisions. It is likewise immaterial whether this Court agrees with the conclusion reached by the lower Court in passing on the facts submitted to it as a jury. Keeping these well settled principles in mind, we must examine the evidence in the record and determine whether it was legally sufficient to be submitted.

It was provided in the agreement of March 29th that the balance of $1,500 was to be paid on the 10th of April, "otherwise this agreement is null and void and the party of the first part (appellant) is authorized to deduct what expenses have been entailed upon him by this said agreement from the said $500 paid on account," and it was further provided that the appellant account to the appellees for all business done after April 1st—meaning, of course, in case the appellees paid the balance of the purchase money ($1,500) as agreed upon. The appellant was therefore in charge until that balance was paid. His employees—his brother Herbert and the one spoken of as "the crippled boy"—attended to the butter routes, although according to the arrangement Mr. Hoey went with them to familiarize himself with them.; but, according to his evidence, was not introduced to any of the customers and did not come in contact with them. The plaintiffs testified that that was in conformity with the suggestion of the appellant, and, although the defendant denied that, in the consideration of the prayer the appellees' evidence must not be overlooked. There is some confusion about the dates. Mr. Hoey testified that Herbert Chenoweth left somewhere about the 6th of April. Apparently that is a mistake, and Herbert testified that it was on the 10th. The second agreement is dated the 9th of April, but the money was not paid until the 10th, according to the appellant. Whichever was right as to those dates, there was evidence of both for the Court as a jury to consider and determine upon. Then Mr. Hoey testified that it was the morning. after the expiration of the ten days that he found that the customers had been served, as will presently be more particu-

larly referred to. That was evidently the 15th, which was the Monday after the ten days expired, which was on Wednesday. Not only does the evidence of the defendant himself and of his brother Herbert show that, but the letter of Leo M. Chenoweth, which Mr. Hoey said was written directly after he returned to the store, and the defendant came in answer to a telephone call, is dated April 15th.

Apparently, then, the defendant was in charge as stated above up to and including the 10th of April, and Herbert, who testified he was sick, was not at the store or on the routes on Thursday, Friday or Saturday, being the 11th, 12th and 13th of April. The other employee of the defendant, spoken of as the crippled boy, made the deliveries and accounted with the appellees for those days. Herbert testified that on Wednesday, April 10th, Hoey told him he would not be needed after Saturday, but Hoey denied that. There is, therefore, a conflict of testimony between these parties, but for our present purpose it is immaterial which was correct, as it was for the Court sitting as a jury to determine between them, although, as already indicated, we think the record before us shows that the dates were as the defendant and Herbert said they were. On Monday, the 15th (assuming that date to be correct), neither Herbert nor the crippled boy reported at the store, and Hoey started over the routes with the defendant, who had come at the request of the appellees. They went to four of the customers, all of whom had been served with butter by someone, who afterwards turned out to be Herbert. There were about 50 customers on that route. Hoey testified that he did not go to others, because the defendant suggested that they go back to the store and he gave them a letter, which is as follows:

"Baltimore, Md., April 15th, 1918.
"To the patrons of my butter and egg route:
"This is to introduce Mr. Harry L. Hoey, who has purchased my butter and egg routes for cash, and I would greatly appreciate if you will continue your patronage with him as you have with me. I will con-

tinue to manage the business and will see that you con-
tinue to get the same goods of butter and eggs. If
anyone else calls to see you in reference to supplying
you with butter and eggs, they do not represent the
Chenoweth Butter Co.

"Yours most respectfully,

"Leo M. Chenoweth."

Hoey testified that he then took the letter, and "went to
each and every customer until noon"; that they said: "We
don't know nothing about that; our butter man has been here
and delivered us butter; we don't know who this man is."
He also testified that when the defendant went around with
him they overtook Herbert and his employee that was help-
ing him, and the defendant asked him to stop serving the
routes; that Herbert replied: " 'They are my routes, and I
will do with them as I please; you have sold something you
do not own.' Mr. Leo Chenoweth then made the remark
that he could put the man that was working for Mr. Cheno-
weth behind the bars for something that he held against him.
We went back to the store." There is nothing in the record
to show that the defendant then denied that statement of
Herbert, and when the latter was pressed on cross-examina-
tion to say whether he did not make that remark, he simply
said he did not remember, but did not deny that he had. The
defendant put Herbert on the stand at the trial, but he
answered in the most evasive way, and finally had to admit
that he and the crippled boy had been to all of the customers
which they had gone to on those routes when the defendant
was still the owner of the business. After testifying to the
way he had been turned down, Hoey was asked on cross-
examination: "You laid right down on the job? A. Yes,
sir; my uncle and I put the facts before Mr. Leo Chenoweth,
and he and his brother and family had a conference about it,
but that is as far as it ever went."

There is evidence in the record that the defendant threat-
ened to get out an injunction against his brother, and talked

as if he was ready to do anything he could, but he never took any steps which could be effective. He knew, as his brother did, that he had undertaken to sell those routes to the appellees; that he had taken their money for them, yet we find him still on such terms with that brother that he could have a conference with him and the family about them without accomplishing anything, and then had his brother as a witness to help to defeat the appellees from recovering the money for routes which his brother and former employee had taken possession of a few days after he claims to have turned them over to the appellees. In addition to that he said in his letter of the 15th of April that he would continue to manage the business and to see that the patrons would get the same goods of butter and eggs as before. The first day that the appellees undertook charge of the routes, without the employees of the defendant, they found those employees in charge for one of themselves who claimed to own the route, at least that the defendant did not own them, and although the defendant said he was to continue to manage the business he did nothing but talk and tell the appellees what he was willing to do.

Hoey testified over and over again that those routes were never delivered to them, and that evidence is in the record without objection. As we have seen, the prayer does not refer to the pleadings, and hence there was no question whether such evidence was admissible under the pleadings. Indeed, it would be difficult to say that there was no evidence which tended to show that the defendant did not aid and abet his brother in his conduct, which, to say the least, was not such as reflects any credit on him. Mr. Wahl, one of the appellees, testified that the defendant told him he was going to sell because his brother had become dissatisfied with the business, and was going out of the butter business; yet in five days after the defendant received the money from the plaintiffs the brother was at work with the former employee of the defendant in taking possession of the routes. The defendant said he did not lay much stress on the routes, but the appellees did, and Mr. Wahl testified that at the time of the pur-

chase he valued them at one-third of the business, and later discovered that they were to be valued at one-half of it.

We have not thought it necessary to discuss the effect of a sale of the good-will of a business. While good-will will not be protected from the competition of a rival, and the mere fact that a brother of the seller is interfering does not necessarily mean that there has been a violation of a contract not to re-engage in the same business, yet if the business is carried on under another name, or by another person, or the name of such others is used as a mere cover or blind to conceal the interest of the seller, relief will be granted, provided it clearly appears that the seller is connected with the competing concern and aggressively acted with or for it to the injury of the plaintiff. 12 *R. C. L.* 987, par. 11. Without quoting from them, we will refer to several Maryland cases which show how far our predecessors have gone to protect parties who had made purchases on the faith of such contracts from being imposed on by the sellers using the name of others. *Davis* v. *Barney,* 2 G. & J. 382; *Guerand* v. *Dandelet,* 32 Md. 561, and *Webb* v. *McCloskey,* 68 Md. 196. We, of course, do not mean to say that the appellant had any financial interest in Herbert's business, but from his conduct and all the circumstances it might be inferred that he was aiding him. But, regardless of that, we are of the opinion that there was sufficient evidence of a failure to deliver those routes as the agreement contemplated to justify the rejection of the prayer, and the judgment must be affirmed.

> *Judgment affirmed, the appellant to pay the costs.*