ALEXANDER R. CARR, An Infant, by his Mother
and Next Friend, Katherine M. Carr,

*vs.*

THE UNITED RAILWAYS & ELECTRIC COMPANY
OF BALTIMORE.

*Electric Railway—Licensee on Car—Degree of Care—Prayers—
Reference to Pleadings.*

Where neither of the plaintiff's prayers which were granted
referred to the pleadings, the correctness of the instructions
must be determined entirely by a consideration of the evidence.
p. 308

Where the conductor of defendant's electric car gave permis-
sion to plaintiff, a boy fifteen years of age, to get on the car for
the purpose of riding across a bridge, with an implied under-
standing that plaintiff would get off at the end of the bridge,
and plaintiff accordingly got on the outer left-hand side of the
rear platform, holding on to the bar in front of him, the safety
gate on that side being closed, and at the end of the bridge the
conductor, instead of stopping the car, so as to enable plaintiff
to alight, and with full knowledge of his position, speeded up
the car, with the result that plaintiff was thrown therefrom, it
was error to direct a verdict for the defendant.         p. 310

Where a person, without invitation from or compensation to
a railroad company, goes on its car for a purpose wholly his
own, and in which the company has neither interest nor con-
cern, he is a mere licensee, but the company nevertheless owes
to him the duty to use ordinary care for his preservation in case
he is discovered to be in a position of peril, and to refrain from
inflicting willful or wanton injury.                    p. 311

*Decided December 9th, 1919.*

Appeal from the Court of Common Pleas of Baltimore
City (STANTON, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS,
PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*Richard A. Miller, Jr.,* and *Austin J. Lilly,* for the appellant.

*J. Stanislaus Cook* and *J. Pembroke Thom,* for the appellee.

BURKE, J., delivered the opinion of the Court.

Suit was brought by Alexander R. Carr, an infant, by his mother and next friend, against the United Railways and Electric Company of Baltimore, a body corporate, to recover damages for personal injuries alleged to have been caused by the negligence of the defendant. At the conclusion of the plaintiff's case the Court granted three prayers: *First,* that there was no evidence legally sufficient to entitle the plaintiff to recover; *second,* that there was no evidence of any negligence of the defendant, its agents and servants, which was the direct and proximate cause of the injury; and *thirdly,* that the plaintiff was guilty of negligence which directly contributed to the cause of the injury sued for. Neither of the prayers refers to the pleadings, and in the absence of such reference the correctness of the instructions must be determined entirely by a consideration of the evidence. This is firmly settled in our practice. In obedience to these instructions the jury found their verdict for the defendant, and from the judgment entered thereon the plaintiff has brought this appeal.

The following facts appearing in the evidence adduced in support of the plaintiff's case are all that need be stated to enable us to dispose of the legal questions raised upon the record. The defendant owns and operates an electric railway which runs through Baltimore City to Bay Shore Park, in Baltimore County. On June 3, 1916, the plaintiff, who was then about fifteen years of age, attended a Sunday School picnic at Penwood Park, in Baltimore County. This park was located some little distance from the line of the defendant's road, and there was a roadway leading from the defendant's tracks to the park. At the intersection of this road with the defendant's right of way, which it crosses at grade,

there is a platform provided for passengers to alight from or enter the cars, but it does not appear to be a regular stopping place. Approximately one-half of a mile eastward from the Penwood Park crossing the defendant's road crosses Jones' Creek over an open bridge owned by the defendant. There is no railing or other protection on this bridge, and no boards or ways provided for pedestrians to walk across it. It is a drawbridge. At the west end of the bridge there is a stopping place at grade similar to that at the Penwood Park crossing. Between that crossing and the bridge the track is of "T" rail construction, and there is a curve in the track beginning a short distance from the Penwood crossing. From the stopping place at the west end of the bridge there is a path which leads through the woods to the light house and from there to Penwood Park.

The plaintiff used the defendant's road in going to the picnic. He got off at the Penwood crossing and went to the park. He and three companions afterwards went over to the bridge and walked across the ties to the east side where they rented a boat. After having returned the boat, he and his companions walked back across the bridge on their return to the picnic grounds. One of the defendant's cars going west approached and stopped at the draw. The plaintiff asked the conductor, who was standing on the back platform of the car, to let him ride across the bridge and was told by the conductor to "jump on." Thereupon the plaintiff got on the outer left-hand side of the rear platform and held on to the bar in front of him. The safety gate on that side was closed. The car went slowly across the bridge, but did not stop at the end of the bridge where the plaintiff intended to alight. What took place at that point is thus described by the plaintiff: "As the front part of the car got on land the conductor gave two bells and it started ahead, and I was scared to jump on account of the fact there was some pebbles down there and there was a hole about that big (indicating), and another car came around at the same time and I was scared of getting hit by the other car, so I just kept on riding." From that

point to the Penwood crossing the car ran with great rapidity, the plaintiff clinging to the bar in full view of the conductor. The plaintiff thought the car was running at the rate of forty miles an hour. It slackened its speed at the curve mentioned, but when it had gotten around the curve the conductor gave two bells and the car increased its speed. The plaintiff testified that: "When it had speeded up the jar was so great that it broke my hold and threw me right off and my head went up in the air and that is all I know." Several witnesses testified as to the rapid speed of the car at the time the plaintiff was injured. One said it was going as fast as he had ever seen a car go. The plaintiff was thrown in the air and fell in between the car tracks. The car did not stop. The plaintiff was seriously and permanently injured.

Assuming, as we must do in passing upon the prayers, the truth of the facts to which we have referred, we are of opinion that the Court below fell into an error in withdrawing the case from the jury. The conductor, upon the request of the plaintiff, gave him permission to get on the car for the purpose of riding across the bridge. There was an implied understanding that he would get off at the end of the bridge, but at that point the conductor speeded up the car, and because of that fact and the other conditions referred to by the plaintiff he was unable to alight in safety. The speed of the car was rapidly increased, and his hold upon the bar was broken by the jarring or jerking of the car. There can be no question that in the distance between the bridge and the Penwood road crossing, where the plaintiff fell, the plaintiff was by reason of the rapid movement of the car in a dangerous and perilous position. His peril was open and obvious to the conductor, who stood beside him during the entire distance. A boy in that situation is apt to be overcome by fear and lose his presence of mind and his power to protect himself. The conductor must have been aware of his peril, and could easily have saved him either by stopping the car or opening the safety gates and admitting him to the rear platform but he not only did nothing to save him, but manifested no interest in him either before or after he was injured.

Under the facts herein stated it was the duty of the conductor to have used ordinary care for the safety of the plaintiff after he became aware of his dangerous situation. In the note to *Peterson* v. *South and Western Railroad,* 8 L. R. A. (N. S.) 1240, it is said that "the uniform holding of all the courts on the subject is, that where a person, without invitation from or compensation to the railroad company, goes upon its cars for a purpose wholly his own and in which it has neither interest nor concern, with its bare permission or acquiescence, he is a mere licensee to whom the company owes no duty except to use ordinary care for his preservation after discovering his peril, and to refrain from inflicting wilful or wanton injury." This rule was applied in *Rosenkovitz* v. *United Railways Co.,* 108 Md. 306. The rule obtains even in the case of trespassers on the railways tracks. In *Western Md. R. R. Co.* v. *Kehoe,* 83 Md. 452, the Court said: "As no one has a right to be negligently or wrongfully on a railroad track, the company owes no duty to a person so situated to anticipate that he will be in such a position; but if its servants see him in a place of peril, though he be wrongfully or negligently there, then the duty arises to avoid injuring him if possible. The duty which the company owes to such a person originates only when the perilous position is seen or known by the company's servants. When, therefore, a plaintiff is wrongfully or negligently on the tracks of a railroad in a position of peril, as the prayer we are considering assumes was the fact in the case at bar, the duty of the company to use due care to avoid injuring him arises at the moment the servants of the company see and become aware of his peril; and hence, to sustain this branch of the prayer, it was essential for him to show, first, that the company's servants had knowledge of his peril." It follows that the judgment must be reversed and a new trial awarded.

> *Judgment reversed, with costs and a new trial awarded.*