# BALTIMORE AND OHIO RAILROAD COMPANY

## vs.

## GEORGE WALSH.

*Railroad Engines—Collision on Converging Tracks—Sidings and Switches—Negligence—Demurrer to Evidence—Review on Appeal.*

In dealing with a prayer to the effect that the evidence is not legally sufficient to warrant a recovery, the court passes only upon the legal effect of the evidence without reference to the pleadings.                                             p. 237

Under Code, art. 5, sec. 9A, a prayer to the effect that under the pleadings there is no evidence legally sufficient to entitle plaintiff to recover, cannot be considered on appeal, since it is necessarily based upon a variance between the pleadings and the proof, and the statute provides that a question of such variance cannot be considered as having been raised by a prayer which fails to state specifically the points wherein the variance exists.                                             p. 237

A private company using the tracks of a railroad company for its locomotives, while passing from one of its sidings to another, by the permission of the railroad company, but not under a contract or an invitation express or implied, is to be regarded as using the tracks, not as an invitee, but as a mere licensee.                                             pp. 238-242

A railroad company, operating its locomotive on its own main track, is not bound to assume that a switching engine on a converging siding, which belongs to a private company, will, although the switch connecting the siding and main track is closed, run so close to the switch as to "foul" the main track.                                             p. 243

The crew of an engine on a main track were not guilty of negligence because they failed to stop the engine on the approach of a switching engine on a converging siding belonging to a private company, the switch leading from the siding being at the time closed, and the crew having no reason to sup-

pose that the latter engine would go on the main track until its crew had opened the switch and ascertained the way to be clear.

pp. 243, 244

The doctrine of "the last clear chance" cannot apply when there is no evidence that defendant's employees knew of plaintiff's perilous position in time to have avoided the accident.

p. 245

*Decided January 10th, 1923.*

Appeal from the Superior Court of Baltimore City (STAN-TON, J.).

Action by George Walsh against the Baltimore and Ohio Railroad Company. From a judgment for plaintiff in the sum of $3,000, defendant appeals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Duncan K. Brent,* with whom was *Allen S. Bowie* on the brief, for the appellant.

*William D. Macmillan,* with whom was *Harold Tschudi* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This suit grew out of a collision between one of the appellant's locomotives and a small switching engine owned by the Union Shipbuilding Company and operated by its employee, George Walsh, the appellee, on the appellant's tracks at Fairfield, Curtis Bay, on February 15th, 1921. Walsh, who was painfully and seriously injured in the collision, applied for and was awarded compensation under the Workmen's Compensation Act, which was paid by his employer.

Walsh contended that the collision was due to the appellant's negligence, and on December 23rd, 1921, in the Superior Court of Baltimore City, he brought this action, which in regular course came on for trial and, the verdict and judgment in that trial being against the appellant, this appeal was taken.

There are three exceptions in the record. Two of these relate to the admissibility of evidence and are of minor consequence. The other relates to the court's rulings on the prayers and presents the substantial question in the case, which is whether, under the pleadings, the appellee was entitled to recover at all upon the evidence in this case, and the consideration of that question involves a review of the pleadings, the prayers and the evidence.

The declaration, which was filed by Walsh for his own benefit and that of his employer, contains two counts. In the first count the negligent act complained of is said to be this, that while the plaintiff, in operating the Union Shipbuilding Company's locomotive, "was proceeding" to pass along the tracks of the defendant where they connect with the tracks of the Union Shipbuilding Company and while "the fireman or brakeman of the plaintiff's locomotive was in the act of making the necessary switch connections for the locomotive operated by the plaintiff as aforesaid, a locomotive engine owned by the defendant was so negligently, carelessly and unskillfully operated over and along the tracks of the said defendant, by its agent and servants in the course of their employment, as to run into and against the locomotive operated by the plaintiff as aforesaid, with great force and causing the plaintiff to be thrown from his seat in said locomotive to the ground." In the second count, the plaintiff, after charging the negligence referred to in the first count added this: "And that at the time of the accident herein referred to the defendant, its agents or servants, saw, or by the exercise of ordinary care could have seen the locomotive operated by the plaintiff as aforesaid in the position it was at that time,

and could have avoided this accident by the exercise of ordinary care and skill in the operation of said locomotive; but notwithstanding that, the defendant's locomotive, operated by its agents and servants as aforesaid, collided with the locomotive in which the plaintiff was riding, causing the plaintiff to be thrown from his seat in said locomotive to the ground." To this declaration the general issue plea was filed and issue joined thereon.

At the conclusion of the whole case the plaintiff offered one prayer, the usual damage prayer, which was granted, and the defendant nine prayers, of which all were granted but the first, second and third, which were refused. The three rejected prayers were intended to raise these questions, one, was the evidence in the case legally sufficient to allow the plaintiff to recover; two, was it legally sufficient to allow him to recover under the pleadings, and three, was he barred by any negligence of his own contributing to the accident. As these questions involve a consideration of the force and the effect of all of the evidence in the case, it will be necessary to review that evidence in some detail.

The appellant maintained and operated two tracks at the place where the accident occurred. The Union Shipbuilding Company operated and maintained several sidings adjacent to the appellant's tracks and physically connected with them by switches. In going from one of these sidings to another, the locomotives of the shipbuilding company necessarily used the main tracks of the appellant because, while they were all connected with those tracks, they had no other connections with each other.

Walsh was a locomotive engineer and his duty was to shift freight from one siding to another by means of the shipbuilding company's locomotive which he operated, and in the course of this work he would go on the main tracks of the B. & O. Railroad and switch off on to one or another of these sidings as often as half a dozen or more times a day, and the railroad company knew that he used the B. & O. Railroad tracks in that way.

On the occasion of the accident he was operating his engine on one of the switches known as the "warehouse switch." The day was clear and the engine was running backwards light, and there were on it at the time William Hutchins and Victor Toutant. This siding, which runs from southwest to northeast, formed a curving tangent to the railroad company's tracks which run nearly east and west, and the space between the two was entirely clear and unobstructed. Toutant was on the right side of the engine when facing in the direction in which it was running, and Bill Hutchins, the fireman, was on the left side of the steps on the back of the engine. Walsh was taking the engine over the siding to the B. & O. main tracks, intending to take it along those tracks to another siding of the shipbuilding company, and the collision occurred, apparently, just as his engine reached the B. & O. Railroad tracks. The engine had not gone through the switch, but its overhang projected partly over the main track and the appellant's engine, passing along the track at that time, "side swiped it."

George Walsh, the plaintiff, in describing the accident, said: "A. When I got to the switch or near about the switch Bill Hutchins jumped off to throw the switch and I almost come to a standstill, and I heard a little noise, and I looked around and the thing was on me and smashed into me, the B. & O. engine. * * * As soon as I seen it had my engine in back motion, I threw the reverse bar in the forward motion and tried to get out of the way when I seen it coming on me, but before I could get out of the way it struck me, knocking me out of the cab to the ground. That the engine on which he was riding had the bumper torn under it and that after the accident it went down the track into the ship yard; that he did not open the throttle, but he did put the bar in forward motion; that he says the blow from the B. & O. engine opened the throttle, because the throttle is always shut, and when the blow came it must have opened it. * * * When Bill Hutchins jumped off to throw the switch I heard the

noise and I looked around and they were there right on me; that is when I first noticed him coming from the cross-over switch from the track they were on to the track I was on and side-swiped me." He further testified that the engineer on the B. & O. engine did not blow any whistle or give any other signal. On cross-examination, after testifying that when the collision occurred his engine was partly on "the main track of the B. & O., and that Hutchins had got down to throw the switch but had no opportunity to do it before the crash came, and that the switch was set against him, that it was necessary for Hutchins to change the switch before his engine could get on the main tracks, that it would not derail the engine to go through a closed switch, but would break the switch, and that he did not certainly know whether Hutchins had thrown the switch when the crash came, he gave this testimony: "Q. You see this point, there is a switch and there is another; it is full of switches in there; here is the cross-over; here is the main track? A. Your cross-over switch was wrong; it was open for the B. & O. man to come across. Q. It was wrong for you? It was set for the B. & O. and not for you? A. Yes, sir."

William J. Hutchins, the fireman on the engine which Walsh was driving, testified that he first saw the B. & O. engine as he was getting down to throw the switch, and that it was then about six feet away, and that when he saw it he ran to get out of the way, that "he was standing on the left side of the engine backing out and could see down the Prudential Company's siding of the B. & O. Railroad Company tracks about 300 yards; that he was facing in the direction in which he was going; that the Prudential Oil siding would be to his left; that in order to get on the main track of the B. & O. it was necessary to turn a switch; that he did not have time to turn the switch before the accident happened; that the Union Shipbuilding Company's locomotive was not ten feet away from the switch when the accident happened." On cross-examination he testified that coming down the warehouse

siding he was on the step of the left hand side of the engine backing out, on the southern side of the track, that he stepped off just as the engine on which he was riding came to a stop to throw the switch which was set against that engine. On re-direct examination he testified that he did not look over to the Prudential siding (from which the B. & O. engine was coming), although his view of it was unobstructed, but looked straight ahead in the direction in which the engine on which he was riding was going. Victor Toutant testified, on the occasion of the accident he was on the engine with Walsh and Hutchins, standing on the right or north side, that he saw no engine on the B. & O. tracks although he looked to see if there was any. He was then asked "what happened when you were about to go on the main track of the B. & O. ?" and he answered: "We were just about to enter on the track, the switch was against us, and we had to stop and throw the switch before we got across; William Hutchins got off; stepped off the step on the left hand side of the engine backing out to throw the switch; just stepped right back of the Union Shipyard engine again to get out of the way of the B. & O., and as I noticed him step back I just turned around and noticed Mr. Walsh reverse his engine, and the crash came." He further testified that the B. & O. engine was eight or nine feet away when he first saw it, and that he heard no bell or whistle.

William H. Blakeman, the manager of the Union Shipbuilding Company, testified that the company's locomotive was used to push empty freight cars on the B. & O. tracks and to go from one siding to another, and that it would go on the B. & O. tracks from one to a dozen times a day and that so far as he knew there had been no remonstrance on the part of the railroad company to that use of the tracks.

The testimony offered for the defendant was to the effect that the switches connecting the sidings with the main track were "lined up" for the B. & O. engine, "set green," which gave that engine the right to run through them. That an engine could not get entirely on the main track of the Balti-

more and Ohio Railroad without going through two switches, and that at the time of the accident these switches showed a clear way for the appellant's engine and were set against the engine driven by the appellee; that in approaching the switch a bell was rung. That in backing no one is kept on the back end of the engine as a lookout because it would be too hazardous; that the engineer kept his eyes on the switches to see they showed up correctly, and that no watch was kept on the sidings except at the switch points; that even if the crew of the B. & O. engine had seen the engine on the siding, "that would not indicate it was coming out on the B. & O. main track.

This is in substance all the evidence material to the questions before us and as to most of its essential facts it is undisputed.

The first question presented for our consideration in connection with these facts is naturally whether they are legally sufficient to show primary negligence on the part of the appellant, and that question the appellant has attempted to raise in its first and second prayers. The first prayer presents the proposition that the evidence is not legally sufficient to warrant a recovery, and in dealing with that prayer we pass only upon the legal effect of the evidence without reference to the pleadings. *Chenoweth* v. *Hoey,* 135 Md. 97; *Carr* v. *United Railways Co.,* 135 Md. 307.

The second prayer asserts the proposition that under the pleadings there is no evidence legally sufficient to entitle the plaintiff to recover. It is urged that under the provisions of article 5, section 9 A, Code Pub. Gen. Laws of Maryland, the prayer is too general in its form to present any question which this Court can consider. The underlying theory of the prayer is that, even if the evidence does show that the defendant was negligent, nevertheless, as the negligence thus shown is not the negligence complained of in the declaration, there can be no recovery. In other words it is necessarily based upon a variance between the pleadings and the proof. But as it does

not specifically designate the points at which the variance exists, this Court is precluded by the statute referred to from considering the objection. *Western Union Tel. Co.* v. *Bloede,* 127 Md. 344; *Fulton Bldg. Co.* v. *Stichel,* 135 Md. 542; *Rasst* v. *Morris,* 135 Md. 243.

We will therefore return to the point made by the first prayer, to wit, that the evidence in the case is not legally sufficient to show any primary negligence on the part of the appellant.

Whether negligence on the part of the appellant may be inferred from the facts of this case depends largely upon the weight and effect to be given to the evidence relating to the condition of the switches connecting the warehouse siding with the main tracks of appellant's railroad at the time of the accident. It is undisputed that these switches were "set against" the appellee and for the appellant's locomotives. There is no evidence of any defect in the appellant's track or locomotives, but it is contended that the appellant owed to persons in the lawful use of the "warehouse siding" the duty of anticipating that, as an incident of such use, locomotives might at any time be driven from that siding on to the main tracks of the appellant, and that it was in consequence bound to use ordinary care to avoid injuring persons operating such locomotives, and that it violated that duty by failing to exercise sufficient vigilance to detect the approach of the locomotive operated by the appellee. In that proposition the appellee assumes that the Union Shipbuilding Company and its employees operating its locomotive used the appellant's tracks as invitees, but there is no evidence of that fact to be found in the record. It does appear that the shipbuilding company's locomotive frequently used the appellant's tracks in going from one of its sidings to another, and it may be inferred that such use was permissive, to the extent at least that there was no protest against it by the appellant, but there is no evidence that such use was based upon any contract, or upon an invitation express or implied and extended by the appellant. It can-

not, therefore, be assumed that the appellee was, on the occasion of the accident, using the appellant's tracks as an invitee but that in such use he was a mere licensee, since no other conclusion is open to us under the decisions of this Court.   In *Maenner* v. *Carroll,* 46 Md. 193, the owner of an open lot of ground in the City of Baltimore, over which persons were in the habit of passing, dug a deep excavation in it.   The plaintiff passing over the lot at night and, being ignorant of the existence of the excavation, fell into it and was injured. In dealing with the status of the plaintiff at the time of the injury, JUDGE ALVEY, speaking for the Court, said: "It was not proved, nor is it contended, that there was ever any express license or consent given either to the plaintiff or to the public generally to pass and repass over the lot; but it is said that because the lot was an open common, and every person was allowed to pass over it who desired to do so, and that people were in the habit of so passing, without hindrance or objection from the defendants, therefore, by legal construction, a license is to be implied to the plaintiff to pass and repass at pleasure, until such license was revoked by some positive act or declaration of the defendants.   But we think this conclusion is not warranted by the facts relied on by the plaintiff; for if it be conceded that people did so use the lot, in the absence of authority for such user, the presumption would be that they were trespassers, unless the user was of a character and duration to be evidence of a right of way in the public by prescription—a proposition no longer involved in this case.   If, however, it could be concluded from the evidence that there was such license or permission as contended for by the plaintiff, it is shown by the authorities already cited, that such license or permission conferred no such right upon the plaintiff as to entitle him to sue the defendants for obstructing the way, unless there was some concealed trap or excavation made in the way, which the plaintiff could not have discovered by the use of ordinary and proper diligence while in the use of the license."

In *Balto. & O. R. Co.* v. *Allison,* 62 Md. 487, the Court said: "The mere user of such a path for foot passage, without objection on the part of the company, cannot be construed into an invitation to so use it, and the use of such a perilous way of travel in the day time could hardly justify an expectation that any body could be so foolhardy as to attempt it at night, at which time the evidence is it was never used in that way."

In *Benson* v. *Baltimore Traction Company,* 77 Md. 539, the plaintiff, who was a student at the Baltimore Manual Training School, with the permission of the defendant granted at the request of the principal of the school, visited the defendant's power house and was injured by falling into an unlighted and unguarded vat of boiling water. In dealing with those facts this Court grouped persons lawfully on the premises of others in three classes: "1. Bare licensees or volunteers. 2. Those who are expressly invited or induced by the active conduct of the defendant to go upon the premises. 3. Customers and others who go there on business with the occupier." And discussing that classification it is said: "'The principle,' says Mr. Campbell in his *Treatise on Negligence,* 'appears to be that invitation is inferred where there is a common interest or mutual advantage, whilst a license is inferred where the object is the mere pleasure or benefit of the person using it.' * * * In *Hounsell* v. *Smyth,* 7 C. B. N. S. 738, the distinction is clearly drawn between the liability of a person who holds out an inducement or invitation to others to enter on his premises by preparing a way or path by means of which they can gain access to his house or store, or pass into or over the land, and a case where nothing is shown but a bare license or permission tacitly given to go upon or through an estate, and the responsibility of finding a safe and secure passage is thrown on the passenger and not on the owner." Nor are the later cases of *Sheridan* v. *B. & O.,* 101 Md. 50, and *Burke* v. *Md., Del. & Va. R. Co.,* 134 Md. 156, at all in conflict with the cases cited.

In the *Sheridan* case, the plaintiff was injured while crossing a long freight train which was blocking a public highway after he had been told by a brakeman on the train to make the crossing. For years heavy trains had become stalled at that crossing and it had become customary for users of the highway, obliged to cross the tracks, to crawl over or under the cars. In that case the injury occurred, not on the private property of the railroad company, but on a public highway, in the use of which the rights and duties of the company and the public were to an extent reciprocal. And that distinction was recognized by the Court when it said: "Under somewhat similar circumstances we said in *Siacik's Admr.* v. *North. Cent. R. R. Co.,* 92 Md. 219, the railroad company's 'servants might have known from experience and ordinary observation of the blockading of streets by railway cars that some people would likely climb over, between, or, if small enough, under the cars in order to cross the street.' A jury might conclude that this conduct of the appellee in the present case in so long permitting the crossing of its stalled trains amounted to an implied assent or invitation to the appellant to cross between the cars of the train which on the day of the accident, for so long a time closed the passage from his home to his place of labor. If so the appellee was bound to exercise reasonable care to protect him in accomplishing the crossing which he was with its consent attempting to make."

In the *Burke* case, *supra,* the defendant operated a steamship line between Love Point and Baltimore. To induce patronage it advertised "crabbing and fishing" at Love Point and permitted the public to use its wharf for such purposes. It also conducted a store on the wharf. The plaintiff, who had been fishing from the wharf, was on his way to the company's store, on the wharf, to make some purchases, when he was injured by the defendant's negligence.

It was upon these facts that the Court held that the plaintiff was invited by the defendant's conduct to be upon the premises.

But there is nothing in this case to show that the defendant was to derive any benefit from the plaintiff's use of its tracks, but on the other hand it shows that the locomotive on which the plaintiff was riding was being taken from one of his employer's sidings to another, and that it was for that purpose he proposed to use the plaintiff's tracks. Under such circumstances he was at most a licensee. *Elliott on Railroads,* secs. 1785, 1786. And the only duty which the appellant owed him was to use reasonable care to avoid injuring him after it discovered his danger. *Ibid.,* secs. 1788, 1789.

In the absence of evidence of any agreement, we cannot assume, from the mere fact that the siding was connected by a switch with the appellant's tracks, and that the shipbuilding company pushed freight cars from the sidings on to the main track, that it was invited by the railroad to do so, or that thereby the convenience of the railroad company was served, or that it derived any benefit from the connection, nor can we assume from that fact alone that the shipbuilding company was invited to use the main tracks of the appellant as a lateral connection between its sidings, because such use would be quite as consistent with a mere license as with an invitation.

But even if we asume that the appellee was using the appellant's tracks as an invitee and that therefore it was bound to exercise ordinary care to discover as well as to avoid any danger which might threaten him through the use of any agency under its control, we cannot say that the evidence in this case is legally sufficient to show a violation of that duty.

The uncontradicted evidence shows that the tracks of the shipbuilding company and the tracks of the appellant converge at the point where the collision occurred in the form of the letter "V." The appellant's engine and the appellee's engine, each running slowly backwards, were proceeding along the sides of this "V" towards the angle, the former on the main track and the latter on the siding. The crew of neither engine looked for or saw the approach of the other, although either could have been seen by the crew of the other

had they looked. The switches connecting the main track to the siding were closed against the appellee's engine and open to the appellant's engine, and it was only by running so close to the closed switch that a part of it projected over and "fouled" the main track that the appellee's engine could collide with the approaching engine of the appellant. Both engines reached the intersection at about the same time, the testimony being that the appellee's engine either had just come to a stop or was about to stop when the collision occurred.

Under such circumstances it can hardly be said that it was the duty of the appellant, operating its own engine over its own main tracks, even if it had seen the approach of the engine on the siding, to have assumed that it would, in the face of an approaching engine, have run so close to the closed switch as to "foul" the main track. But on the other hand, if the crew of the appellant's engine had seen the approach of the other engine, they would have been justified in assuming that it would not go on the main track until its crew had opened the switch and had ascertained that the way was clear. Certainly the crew of the appellant's engine were not required to stop merely because they saw an engine under complete control proceeding on the siding towards the intersection and wait until they had ascertained whether it was going through the switch. And how can negligence be predicated on their failure to see the engine on the siding when, if they had seen it, they were entitled to presume that it would not leave a place of safety to go into a certain danger.

To hold that railroad companies, in the operation of their lines, are required to stop their trains whenever the presence of other trains or engines on adjacent private sidings are seen in motion towards the tracks on which they are running, under the circumstances of this case, must necessarily seriously affect and hinder them in the discharge of their duties as common carriers, to the detriment of the public, whose welfare and convenience depend so largely upon the prompt and efficient discharge of those duties.

There can of course be no doubt that, if the appellee was an invitee, the appellant owed him a duty to use ordinary and reasonable care for his protection, but by no process of sound reasoning can that obligation be held to have required the appellant to anticipate that the appellee would drive his engine through a closed switch on to the main line of a railroad in front of an approaching engine, when he could by the mere exercise of volition have remained in safety. The case of *St. Louis & S. F. R. Co.* v. *Miles,* 79 Fed. 257, upon which the appellee relies, is not in point. The plaintiff's decedent was injured by the defendant's negligence while engaged in his employer's work on a spur track built by the railway company under an agreement on his employer's land, and his employer and the railway company were in the joint occupancy of the track, and the injury was caused by the act of the railway company's employees in leaving the switch connecting their main line with the spur open, so that a fast train came through it and killed the plaintiff's decedent. Somewhat more in point is the case of *McCabe* v. *Chicago, St. P., M. & O. Ry. Co.,* 88 Wis. 531. In that case the plaintiff was employed by a firm of contractors, who were engaged in unloading building material from cars on a spur track operated by the defendant. For their own convenience they built a movable platform which at times, with the knowledge of the railroad company and without protest on its part, infringed on its track. On the occasion of the accident a furniture car was pushed on this spur track, struck the platform and thereby injured the plaintiff, and in passing upon his right to recover the court said: "The plaintiff was a mere licensee. The defendant owed him no duty of active care. The plaintiff himself was bound to the exercise of the highest care to shield himself from injury. He had no reason to expect that the defendant would regulate the running of its trains, or change the course of its business, to suit his purposes or convenience. He could expect from it only such consideration and ordinary care as it owes to the general public." While we do not adopt

in their entirety these expressions, they illustrate the views we have expressed.

Some reliance was placed upon the doctrine of the "last clear chance," but the principles involved in that rule have no application to the facts of this case. There is no evidence of any kind to show that the appellant's employees knew of the appellee's perilous position in time to have avoided the accident, but on the contrary the undisputed evidence is that he did not arrive in that position until it was too late for them by any possible exercise of care to prevent the collision.

For the reasons stated, the first prayer of the appellant should have been granted and the judgment appealed from must be reversed. In view of this conclusion, it becomes unnecessary to discuss the question of contributory negligence, or the rulings involved in the remaining exceptions.

*Judgment reversed without a new trial, with costs to the appellant.*