# THOMAS BURKE

### *vs.*

## MARYLAND, DELAWARE AND VIRGINIA RAILWAY COMPANY, A Body Corporate.

*Negligence: steamboats unloading freight; injuries to persons on wharf; implied invitation to board boat; not mere licensees or trespassers. Doctrine of res ipsa loquitur.*

A steamboat company was unloading heavy trucks from a steamer at the company's wharf; one heavily loaded truck came down the incline with such an impetus that the men in charge lost control of it, and it ran across the wharf, unhinging a gate and injuring the plaintiff, who was standing there awaiting the discharge of the passengers: *held,* that the facts presented a case which should have been left to the jury to find whether or not the accident was caused by the negligence of the defendant or of its servants.                                    pp. 157-165

Where a steamboat company permits persons to come aboard for the purpose of buying candy or cigars, or for taking meals while the boat lay at the wharf, it is such an implied invitation to the people to come aboard that those who go upon the wharf to board the boat for that purpose are not to be regarded as trespassers or as mere licensees.                                    p. 161

*Decided March 6th, 1919.*

Appeal from the Circuit Court for Caroline County. (Constable, C. J., Hopper and Adkins, JJ.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON and URNER.

*T. Alan Goldsborough* and *Howard Bryant* (with whom was *J. H. C. Legg* on the brief), for the appellant.

*Henry R. Lewis,* for the appellees.

THOMAS, J., delivered the opinion of the Court.

The declaration in this case alleged that the defendant, the Maryland, Delaware and Virginia Railroad Company, as a common carrier of passengers, owned and operated a steam railway, and certain wharves connected therewith, from Love Point, in Queen Anne's County, Maryland, to Lewes, Delaware, and that in the conduct of its said business the defendant owned and used a pier or wharf at Love Point, where its boats made connection with its railroad, "to and from Baltimore," and that on the 4th of September, 1914, while the plaintiff was lawfully on said pier, the defendant, in unloading one of its express trucks from one of its steamers, negligently caused said truck to run into a gate on said pier with such force as to knock the gate off its holdings and cause it to strike and fall upon plaintiff, whereby he was permanently injured.

This appeal brings up for review the ruling of the Court below instructing the jury, at the conclusion of the plaintiff's testimony, that he had offered no evidence legally sufficient to entitle him to recover, and that the verdict should be for the defendant.

No question was made in the oral argument of counsel, or in his brief, as to the sufficiency of the evidence to show that the defendant owned or operated the pier referred to, and in the discussion of the case we will, in so far as it may be necessary to do so, treat that as a conceded fact.

The evidence shows that the pier extends from the shore in an easterly direction, and that the boats land on the north or south side of the pier, depending upon the wind and tide.

On the south side of the pier there is a railroad track, and the cars of the defendant are run out on the pier to receive and discharge passengers and freight or expressage. The rails of the track are described as being "flush with" the floor or boards of the pier, and when a boat lands on the south side of the pier passengers coming off and going on the boat cross over the track and through gates in a fence running between the north and south side of the pier. This fence is from six to eight feet from the north rail of the track, and there is about the same space between the south rail of the track and the south edge of the pier.

The plaintiff stated that he had been going to Love Point for a number of years, and that a day or two before the accident he went there to spend a few days. He also stated that he had been in the habit of crabbing and fishing on the pier; that the defendant advertised fishing and crabbing as one of the attractions of Love Point; that persons staying at Love Point, and those who came there on the boat to fish and crab, fished and crabbed on the pier; that the gates in the fence referred to were kept open, and persons generally fished on any part of the pier; that the defendant kept a store and a barber shop on its boat, and also furnished meals on the boat, and that while the boat was at the pier people staying at Love Point and those who came down on the boat to fish and crab generally went to the boat to buy things, to get shaved or to get a meal.

On cross-examination he testified as follows: "Q. You were not there to take passage either on the boat or train? A. No, sir. Q. Not at that time. You said you had a return trip ticket? A. I had in my pocket, yes, sir. Q. You were not there for the purpose of receiving any freight that came on that boat or train? A. No, sir. Q. You were not there to ship anything on the boat or train at all? A. No, sir. I was there on a recreation pier. They consider that one of the attractions at Love Point, for fishing and crabbing. I never heard the question raised or any objection made where you were on the pier, when you went on and when

you came off, in my life, and I have been twenty years going there."

The plaintiff also stated that on the day of the accident he went out on the pier to fish until the boat came; that the boat landed on the north side of the pier; that he had been fishing on the south side of the pier, and that as the boat approached the pier he stopped fishing and walked over to the fence between the north and south sides of the pier and stopped near the gate to wait until the passengers landed and the freight was taken off so that he could go on the boat to get a paper and to purchase some things at the store; that while standing there he noticed a truck being brought off the boat by the defendant's employees; that after they reached the pier they had to make a turn and go up an incline, and that he observed that it was very heavily loaded and that they had difficulty in getting it up the incline; that the defendant had a good many men in charge of that truck, and by the time they got that truck out of the way, another truck came off of the boat with only two colored men in charge of it, and that it came off the boat with such force that it hit the gate and broke it "from its moorings" and knocked it over on him and caused the injury complained of.

Mrs. Shank, who stated that she had had a summer home at Love Point for a number of years, testified as follows: "Q. State what was the custom as to fishing and crabbing along the same side where Mr. Burke was at the time of the accident? A. As far as I know everybody was privileged. Q. State what was the custom? A. The custom, everybody goes there to fish and crab that wants to go. Q. During that season and previous seasons what have you seen going on up and down? A. Crabbing and fishing. Q. Now on the boat, when the boat was in, Mrs. Shank, can you state whether or not meals were served to the public? A. Yes, sir. Q. What else could you buy on the boat? A. We bought cigars, tobacco, candy (they didn't serve ice cream), soft drinks, papers, most anything in that line." On cross-examination she further testified: "Q. You were not there between boat times

except a short time before the boat came? A. That's the very time people would be there because the boat would bring people to fish and crab. Q. People on the boat? A. On almost all the excursions people came and fished and crabbed on the pier. I have seen the hotel guests fishing and crabbing."

John A. Rhodes, who saw the accident, testified as follows: "Q. Will you tell this Court and jury, in your own way, just what you saw in reference to the accident to Mr. Burke? A. Well, the boat landed on the north side of the pier, and in bringing off the trucks she had to turn a corner, which was at the ticket office. Before she turned the corner, about the time she turned the corner, the tongue struck a post. When it struck the post it glanced off and struck the gate and knocked the gate off the bearings, and struck this gentleman here, Mr. Burke, and knocked him down. It has been sometime ago, but, as well as I remember, I think I was one that helped to take the gate off of him. When we took the gate off of him, as well as I remember, it seems to me he sit something like this (illustrating) for a little while. I don't remember what the time was. Somebody caught hold of him and led him up to the train."

There was other evidence tending to show that the tide on the day of the accident was higher than usual, and that it was down-grade from the deck of the boat to the floor of the pier; that the truck which struck the gate was heavily loaded, and that as it came down the gang plank there were not a sufficient number of men in charge of it to control it and make the turn so as to avoid striking the gate or fence opposite the point of landing.

The contentions of the appellee are (1) that the evidence shows that the plaintiff was a trespasser or licensee to whom the defendant owed no duty except "the duty to do him no intentional or wilful injury," and that the duty "of caution and vigilance owed by a railroad company to a trespasser or licensee on its tracks, depots or piers commences when its

agents or employees become, or by the exercise of reasonable care should become, aware of his perilous position," and (2) that the plaintiff "failed to prove that the defendant was negligent in any particular." We are unable to adopt that view in this case.

While our predecessors have approved the statement of Chief Justice Bigelow in *Sweeney* v. *Old Colony & N. R. R. Co.,* 10 Allen, 372, that "a trespasser who comes on the land of another without right cannot maintain an action, if he runs against a barrier or falls into an excavation there situated. The owner of the land is not bound to protect or provide safeguards for wrong-doers. So a licensee who enters on premises by permission only, without any enticement, allurement or inducement being held out to him by the owner or occupant, cannot recover damages for injuries caused by obstructions or pitfalls. He goes there at his own risk and enjoys the license subject to its concomitant perils. No duty is imposed by law on the owner or occupant to keep his premises in a suitable condition for those who come there solely for their own convenience or pleasure, and who are not either expressly invited to enter or induced to come upon them by the purpose for which the premises are appropriated and occupied" (*Benson* v. *Baltimore Traction Co.,* 77 Md. 535), there are cases in that State and elsewhere that hold that although the owner of premises is not liable to a trespasser or licensee for injuries resulting from any defect in the existing condition of the premises, he is liable to a licensee for injuries resulting from any *active negligence* on his part or of his servants. *Pomponio* v. *New York, N. H. & H. R. Co.,* 66 Conn. 528, 32 L. R. A. 530; *Corrigan* v. *Union Sugar Ref.,* 98 Mass. 577; *Stevens* v. *Nichols,* 155 Mass. 472, 15 L. R. A. 459. We are not, however, required in this case to pass upon the correctness of the doctrine of the latter cases, for in our opinion there is evidence in this case from which the jury could have found that the plaintiff was on the pier by the invitation of the defendant.

The invitation may be expressed or implied.  It is said in
29 Cyc. 455, in reference to "Invitation from benefit": "An
invitation to enter upon the premises exists where some bene-
fit accrues or is supposed to accrue to the one who extends
the invitation. * * * This invitation arises in the case of
customers who for the purpose of trade or other business
enter a store, or other place of business, and in the case of
persons attending public places of amusement," etc.  On page
457 of the same volume of Cyc. it is said in reference to
"Invitation from acquiescence;" "While invitation is not
shown by mere toleration of a trespass, or passive acquies-
cence in permitting people upon the premises ,or mere per-
mission for them to be there, or by use without the owner's
knowledge, yet, where the use has been so long continued as to
lead the public to think the owner invited such use, a liabil-
ity has been held to arise as from an implied invitation.  Thus,
where there had been a custom for persons to enter on prem-
ises for certain purposes, with the acquiescence of the owner,
an invitation will be implied."

As instances of implied invitation arising from the benefit
to be derived by the party extending the invitation we may
refer to the cases of *Agri. & Mech. Asso.* v. *Gray,* 118 Md.
600, and *Hochschild, Kohn & Co.* v. *Cecil,* 131 Md. 70.

The doctrine of implied invitation from acquiescence is
recognized in other states and has been applied by this Court.
In the case of *Taylor* v. *Delaware & H. Canal Co.,* 113 Pa.
St. 162, 8 Atl. 43, the Supreme Court of Pennsylvania said:
"But plaintiff's contention is that the jury would have been
warranted in finding negligence of the company defendant
from which the injury complained of resulted; that the testi-
mony tended to prove such facts and circumstances as bring
the case within the general principle recognized and approved
by this Court in *Philadelphia & R. R. Co.* v. *Troutman,* 11
Wkly Notes Cas. 453, in which it is ruled that, where a
person crosses a railroad track by a common and well-known
footpath, used by the public for many years without let or

hindrance on the part of the railroad company and its em-
ployees, he cannot be regarded as a trespasser; and where
it is shown, as was done in this case, that the footpath across
the company's land has been habitually used by the public
for many years without objection, it is for the jury to say
whether the company has not acquiesced in such use. While
such user does not convert the company's right of way into a
public highway, it certainly does relieve persons passing over
the same from being treated as trespassers on the company's
premises; and there is a manifest distinction between the
degree of care which a railroad company is bound to exercise
towards mere trespassers and those who may be using the
right of way by tacit consent or implied permission of the
company. In the case of such long-continued user by the
public, the company and its employes are charged with notice
of the fact, and therefore cannot with impunity neglect pre-
cautions to prevent danger to persons thus using the same."
In the case of *Swift* v. *Staten Island R. T. R. Co.*, 123 N. Y.
648, 25 N. E. 378, the Court of Appeals of New York said:
"The legal principles applicable to the fact appearing here
have been frequently enunciated by this Court to the effect
that where the public have, for a long time, notoriously and
constantly, been in the habit of crossing a railroad at a point
not in a traveled public highway, with the acquiescence of the
railroad company, such acquiescence amounts to a license,
and imposes a duty upon the company, as to all persons so
crossing, to exercise reasonable care in the running of its
trains, so as to protect them from injury." In the case of
*Sheridan* v. *Balto. & Ohio R. Co.*, 101 Md. 50, this Court,
speaking through JUDGE SCHMUCKER, said: "The appellant
was not a passenger and was therefore not entitled to the
exercise by the appellee of the highest degree of care and
diligence in his behalf. Nor was he a mere trespasser to
whom the appellee owed only the duty of abstaining from
wantonly and willfully injuring him. If we admit that it
was beyond the scope of the brakeman's employment to bind

the appellee by the express invitation to cross the train which he gave to the appellant at the time of the accident, we cannot close our eyes to the fact for many years the appellee had acquiesced without objection in the habit of the men working in the factories in that vicinity, of crossing between or under its stalled trains which impeded their passage to and from their daily labor. Under somewhat similar circumstances we said in *Siacik's Admr.* v. *N. C. R. R. Co.,* 92 Md. 219, the railroad company's 'servants might have known from experience and ordinary observation of the blocking of streets by railway cars that some people would likely climb over, between, or, if small enough, under the cars in order to cross the street.' A jury might conclude that this conduct of the appellee in the present case in so long permitting the crossing of its stalled trains amounted to an implied assent or invitation to the appellant to cross between the cars of the train which on the day of the accident for so long time closed the passage from his home to his place of labor. If so the appellee was bound to exercise reasonable care to protect him in accomplishing the crossing which he was with its consent attempting to make."

Even if we assume that there is not sufficient evidence in this case of any *benefit* accruing to the defendant to warrant a finding by the jury that excursionists and persons visiting Love Point were invited to fish and crab on the pier, we think there was ample evidence to justify the finding of an implied invitation from the *acquiescence* of the defendant in such use of the pier. Moreover, at the time of the accident, the plaintiff was not fishing or crabbing, but, according to his testimony, was on his way to the store of the defendant's boat, to purchase some of the things it offered for sale, and stopped at the point where he was standing at the time of the accident to wait until the passengers and freight were discharged. He could not have been regarded as a trespasser or mere licensee in the store of the defendant, and there

would be no greater reason for holding him to be a trespasser or licensee in going on the pier to visit the store.

In reference to the contention that there is no evidence in the case to show that the injury complained of resulted from the carelessness or negligence of the defendant or its agents or servants, and that the maxim *res ipsa loquitur* cannot aid the plaintiff in this case, we might refer to the case of *Weilbacher* v. *Putts Co.,* 123 Md. 249, in which this Court said: "The case most frequently referred to in this State as containing the true statement of the rule is the case of *Scott* v. *London Dock Co.,* 3 Hurl. & Colt, 596, where it is said: 'There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or its servants, and the accident is such as, in the ordinary course of things, does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care.' "

But apart from the maxim referred to, we think there is evidence in the case from which the jury could have found that the accident was caused by the carelessness or negligence of the defendant's servants in charge of the truck, or by the negligence of the defendant in sending the truck off the boat without a sufficient number of employees to direct and control its movements.

It follows from what has been said that there was error in withdrawing the case from the jury, and that the judgment must be reversed and case remanded for a new trial.

> *Judgment reversed, with costs, and a new trial awarded.*