*Mayor and City Council of Baltimore v. Jamie Wallace*, No. 12, September Term, 2024. Opinion by Gould, J.

**TORT LIABILITY – MARYLAND RECREATIONAL USE STATUTE**

The Supreme Court of Maryland held that the Maryland Recreational Use Statute did not shield Baltimore City from common law liability when the City made property available for transportation purposes as part of its public infrastructure, even though the means of transportation utilized in this case, biking, also constitutes a recreational activity.

**TORT LIABILITY – MARYLAND RECREATIONAL USE STATUTE**

The Supreme Court of Maryland held that while at one point the promenade part of the Inner Harbor Park may have been covered by the Maryland Recreational Use Statute, by incorporating the promenade into its transportation infrastructure, the City established an independent right of access separate and apart from any recreational invitation, and, in doing so, assumed the corresponding common law duties associated with that right.

Circuit Court for Baltimore City
Case No.: 24-C-19-004548
Argued: November 8, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 12

September Term, 2024

_____

MAYOR AND CITY COUNCIL OF
BALTIMORE

v.

JAMIE WALLACE

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Gould, J.
Biran, J., concurs.

_____

Filed: July 17, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case arises from the accident suffered by Jamie Wallace on June 19, 2018, when, as she was biking home from work through the promenade part of the Inner Harbor Park, her bike's front tire became wedged in a gap between the bricks and granite bulkhead running along the water's edge, causing her to fall and sustain injuries. Fourteen months later, Ms. Wallace sued the Mayor and City Council of Baltimore (together, the "City") in the Circuit Court for Baltimore City for negligence. Ms. Wallace alleged the City breached its duties "by negligently causing, allowing to remain, and/or failing to warn" her of the gap along the Inner Harbor promenade, of which the City "had actual and/or constructive knowledge[.]"

In addition to contesting liability, the City sought judgment as a matter of law under the Maryland Recreational Use Statute (the "Recreational Use Statute"), codified in sections 5-1101 through 5-1109 of the Natural Resources Article of the Maryland Annotated Code. MD. CODE ANN., NAT. RES. ("NR") §§ 5-1101-1109 (2012 Repl. Vol.). That statute modifies the common law on premises liability by granting protections to landowners who make their property available to the public for, among other things, recreational purposes. NR § 5-1102.

The City asserted this defense in a motion for summary judgment. The City maintained that: (1) it owed no duty of care to Ms. Wallace because the Inner Harbor promenade was designated by the Baltimore City Charter as open to the public for recreational purposes; and (2) Ms. Wallace was riding her bike, which is undisputedly a recreational activity.

The court denied the City's motion, noting that the Recreational Use Statute protects a landowner who makes property "available for educational or recreational purposes" from lawsuits "initiated by individuals using the property for those purposes." The statute did not apply, the court reasoned, because Ms. Wallace was commuting from work and was not using the land for recreational or educational purposes. The court also concluded that the City's interpretation of the statute would "yield an absurd result" because "the City would be absolutely immune from suit filed by anyone injured while bicycling or jogging on a city street."

The City asserted the defense again at trial under two Maryland Rule 2-519 motions for judgment, one at the close of Ms. Wallace's case-in-chief and the other at the close of all evidence, which the court ultimately denied. After judgment was entered on the jury's verdict in Ms. Wallace's favor for $100,000.00 in compensatory damages, the City moved for judgment notwithstanding the verdict under Maryland Rule 2-532. The court denied that motion as well.

The City timely appealed, and in a reported opinion, the Appellate Court of Maryland affirmed. *Mayor and City Council of Baltimore v. Wallace*, 260 Md. App. 388 (2024). The Appellate Court concluded that despite being located within the Inner Harbor Park, the Inner Harbor promenade functions primarily as a public pedestrian walkway and shared bicycle path that serves as a connector between different parts of the city, rather than as a recreational facility. *Id.* at 410. Applying *Haley v. Mayor and City Council of Baltimore*, 211 Md. 269 (1956), the Appellate Court determined that the maintenance of the Waterfront Promenade, described below, is a governmental function which, when

2

negligently performed, could give rise to civil liability when a person is injured as a result. *Wallace*, 260 Md. App. at 407-09. The Appellate Court concluded that the General Assembly did not intend to abrogate that common law duty when, in 2000, it extended the application of the Recreational Use Statute to land owned by local governments. *Id.* at 414-15. Thus, the Appellate Court concluded, the Recreational Use Statute has no applicability here. *Id.* at 416.

The City filed a petition for writ of certiorari, which we granted. *Mayor and City Council of Baltimore v. Wallace*, 487 Md. 213 (2024). The City presented two questions for our review, both of which boil down to this: Did the circuit court correctly determine that the Recreational Use Statute did not apply to the facts of this case? This is a question of law that we review without deference. *See Howell v. State*, 465 Md. 548, 561 (2019). As we explain below, we answer that question in the affirmative and affirm the judgment of the Appellate Court.

## I

## A

The Inner Harbor Park was established in 1978, and through a voter-ratified amendment to the Baltimore City Charter, it was "dedicated to public park uses for the benefit of this and future generations of the City of Baltimore and the State of Maryland[.]" CHARTER OF BALT. CITY art. I, § 9. The park, which includes a sports field, skate park, playground, trees, and vegetation, sits along the Baltimore Inner Harbor and is available for residents and visitors to enjoy without charge.

The Inner Harbor Park brick promenade—the site of Ms. Wallace's accident—is one section of the Waterfront Promenade, an eight-mile "public pedestrian walkway/shared use bicycle path that functions as a waterfront sidewalk for development sites and public spaces that have emerged from the former industrial waterfront." Balt. City, Dep't of Plan., *Promenade Information*, available at https://perma.cc/HMN3-B4AL. The Waterfront Promenade runs along the water's edge of Baltimore's Inner Harbor from the Ritz-Carlton Residences to the Canton neighborhood. The Inner Harbor section of the Waterfront Promenade runs from the World Trade Center to 402 Key Highway.

**B**

In 2006, the Baltimore Department of Transportation published a Bicycle Master Plan to "promote and facilitate bicycling as a safe, convenient and comfortable form of transportation and recreation in Baltimore." Balt. City, Dep't of Plan., *City of Baltimore Bicycle Master Plan* 3 (March 2006) ("*2006 Bicycle Master Plan*"), available at https://perma.cc/2586-CGCW. The 2006 Bicycle Master Plan, which was revised in 2015, was deemed "necessary to improve safety and create a multi-modal transportation system friendly to the citizens of Baltimore." Balt. City, Dep't of Transp., *Baltimore City Bike Master Plan* (2015), available at https://perma.cc/ULC5-79HH. The 2006 Bicycle Master Plan states:

> The design and implementation of this plan supports broad city-wide goals including enhanced safety for city residents, opportunities for youth, healthy neighborhoods, and strengthening Baltimore's economy. The increased presence of bicyclists contributes to public safety with more eyes [] on the street. Bicycling is a great way for urban residents with busy lives to combine healthy exercise with daily travel. Accommodating future population growth typically means more automobiles, congestion and increased pollution.

Providing a safe and convenient bicycle transportation system can help reduce the number of motor vehicles on city streets and the need for additional parking.

This plan also complies with the strategic plan of Baltimore's Department of Transportation that calls for a "comprehensive and modern transportation system that integrates all modes of travel and provides mobility and accessibility in a convenient, safe and cost-effective manner."

*2006 Bicycle Master Plan* at 3.

The plan was intended to, among other things, "guide Baltimore City in creating a lasting bicycle transportation program, by: mapping out an integrated on-street and off-street bikeway network[.]" *Id.* The plan proposed a "450-mile system of on-street and off-street bicycle facilities and routes." *Id.* at 21. The Waterfront Promenade is part of that system. And the plan specifically addresses the Inner Harbor promenade and notes its use for traveling to and from "residences, yachts, restaurants, and places of employment":

The Inner Harbor promenade is a special place for outdoor recreation and strolling. Currently bicyclists are only allowed before 10 am. Outer sections of the promenade on the north side of the harbor, and future outer sections on the south side could be opened to bicycling at all hours, but should be regulated to keep speeds reduced and provide pedestrians the right-of-way. This additional access will serve users who seek an alternative to streets like Boston and Key Highway, or who are traveling to/from waterfront destinations, which include residences, yachts, restaurants, and places of employment.

*Id.* at 30-31.

Thus, the Inner Harbor promenade is part of the City's transportation system and, as such, is used not only for recreational bicycling but also for commuting and other transportation purposes, a point that the City does not dispute. The responsibility for maintaining the Inner Harbor promenade lies with the Baltimore City Department of

5

Transportation. Balt. City, Dep't of Transp., *Maintenance Division*, available at https://perma.cc/6KSG-WBZY.

## II

Before turning to the City's contentions and our analysis and application of the Recreational Use Statute, we will summarize the foundational legal principles implicated in this premises liability case.

## A

Landowners or other possessors of real property owe common law duties to those who enter their properties, but the nature and extent of those duties depend on the status of the entrant. *Balt. Gas & Elec. Co. v. Flippo*, 348 Md. 680, 688 (1998). Maryland has long recognized four classifications of persons who enter a property: trespasser, bare licensee, licensee by invitation, and invitee. *Id.* Trespassers and bare licensees occupy the bottom rung on the duty ladder, licensees by invitation occupy the middle rung, and invitees occupy the highest rung.

A trespasser "is one who intentionally and without consent or privilege enters another's property." *Id.* at 689 (quoting *Wagner v. Doehring*, 315 Md. 97, 102 (1989)). A bare licensee is one who enters the property with the possessor's permission but for her own purposes. *Id.* at 689. For example, if a business owner grants permission to a class of students to visit the business for educational purposes, the students and accompanying teachers are bare licensees. *Benson v. Balt. Traction Co.*, 77 Md. 535, 542-44 (1893). Landowners' duties to trespassers and bare licensees are the same: to refrain from willfully

6

or wantonly injuring them and from creating a new source of danger without warning. *Flippo*, 348 Md. at 689.

A licensee by invitation, or social guest, is one who comes onto the property with permission from the property's possessor. *Id.* Possessors owe such persons "a common-law duty to exercise reasonable care to make the premises safe for the guest or to warn the guest of known, dangerous conditions that the guest cannot reasonably discover." *Martinez v. Ross*, 245 Md. App. 581, 588 (2020).

An invitee is one who enters the property at the landowner's invitation. The invitation may be express or implied. *Burke v. Md., Del. & Va. Ry. Co.*, 134 Md. 156, 162 (1919). Although our caselaw often describes an invitee as a person who enters the property for a purpose related to the landowner's business, *see, e.g.*, *Bramble v. Thompson*, 264 Md. 518, 521 (1972), a landowner may confer invitee status on members of the public through implied acquiescence, even if the landowner derives no benefit from such use. *Burke*, 134 Md. at 162-64.

In *Burke v. Maryland, Delaware & Virginia Railway Co.*, the plaintiff was injured on a pier owned by the defendant, which used the pier for its railway and steamboat operations at Love Point. *Id.* at 159. For years, the plaintiff had been fishing and crabbing on the pier. *Id.* On the day of the incident, the plaintiff had been fishing on the pier and was waiting near a gate to go onto the defendant's boat to buy a newspaper at the boat's store. *Id.* At that time, the defendant's employees were unloading trucks from the boat when a heavily loaded truck came off the boat with such force that it struck a gate, breaking it loose, and causing it to fall on the plaintiff. *Id.* The evidence showed that the pier was

frequently used by members of the public for fishing and crabbing, a point that the defendant advertised as an attraction of Love Point. *Id.* at 158. This Court held that invitee status could be obtained by implication, not only when the possessor derives a benefit from the visit, but also under circumstances amounting to acquiescence. *Id.* at 164.

Almost 50 years later, in *Crown Cork & Seal Co. v. Kane*, we confirmed that invitee status may be acquired in the absence of such a benefit under an implied acquiescence theory:

> But there is another theory of liability for negligence that does not depend on mutual benefit at all. The cases all recognize that an invitation may be express or implied, and there are many cases in which an invitation has been implied from circumstances, such as custom, the acquiescence of the owner in habitual use, the apparent holding out of premises to a particular use by the public, or simply in the general arrangement or design of the premises.

213 Md. 152, 159 (1957).

An owner is liable for physical harm to an invitee caused by a condition on the land if the owner: (1) knows about or would have discovered, by exercising reasonable care, a condition that poses an unreasonable risk of harm to the invitee; (2) should expect that the invitee will not discover the dangerous condition or will fail to protect herself against it; and (3) fails to exercise reasonable care to protect the invitee against the danger. *Deering Woods Condo. Ass'n v. Spoon*, 377 Md. 250, 263 (2003) (quoting RESTATEMENT (SECOND) OF TORTS § 343 (1965)). The rationale is that

> an invitee enters upon an implied representation or assurance that the land has been prepared and made ready and safe for his reception. He is therefore entitled to expect that the possessor will exercise reasonable care to make the land safe for his entry, or for his use for the purposes of the invitation.

*Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 343 cmt. b).

**B**

Two additional common law principles are relevant here. *First*, "a municipal corporation is not liable in a civil action for any default or neglect in the performance of a purely governmental function, such as the maintenance and management of a public park for recreational purposes." *Haley*, 211 Md. at 272-73. *Second*, "the keeping of public highways and walkways under its management and control in a reasonably safe condition is a corporate function of a municipality and it is therefore answerable in damages for failing to exercise such function." *Id.* at 273.

The tension between those two principles came to the fore in *Haley*, where two plaintiffs were injured in separate accidents while descending concrete steps located within Preston Gardens, a public park in the City of Baltimore. *Id.* at 271. The steps were part of a concrete walkway connecting two intersections: one at St. Paul Street, Franklin Street, and the Orleans Street Viaduct on the upper level, and another at St. Paul Place and Franklin Street on the lower level. *Id.* The walkway crossed a grass plot between St. Paul Street and St. Paul Place, providing direct access between these public highway intersections. *Id.* The question in *Haley* was whether the maintenance of the concrete walkway, including the steps, was a governmental function for which the City enjoyed immunity, or a corporate function for which it could incur liability. *Id.* at 272-73.

The Court emphasized that "[t]he mere physical location of the passageway within the park does not of itself decide the function. The use of a particular facility is a determining factor." *Id.* at 272. Despite being physically located within Preston Gardens and maintained by the Department of Recreation and Parks, the Court concluded that the

9

steps constituted "a public highway of the City[.]" *Id.* at 273. The Court determined that the plaintiffs "were using the steps as part of the public highway in order to travel between points which were outside the park and not for recreational purposes." *Id.* The Court also found significant that "numerous persons use these steps and walkways to travel from St. Paul Street to St. Paul Place and *vice versa*." *Id.* Thus, the Court determined that maintenance of the walkway was a corporate function, so the City did not enjoy common law immunity. *Id.* at 273-74.

## III

The City argues that applying the Recreational Use Statute here "is simple." It maintains that the Recreational Use Statute unambiguously applies to the brick promenade in the Inner Harbor Park where Ms. Wallace fell. It argues that the Inner Harbor Park is a charter-designated public park available for recreational use without charge, and that the brick promenade is explicitly part of that park and mandated to be "open to the public" and "free of charge." Pointing to section 5-1101 of the Natural Resources Article, the City emphasizes that the Recreational Use Statute broadly defines "Land" to include "paths" and "trails," which it claims, clearly encompasses the promenade.[1] And, the City maintains,

---

[1] The Recreational Use Statute defines "Land" to mean "land, roads, paths, trails, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to realty." NR § 5-1101(d)(1). Additionally, "'Land' does not include any structure or equipment provided by a unit of local government for the purpose of public recreation." *Id.* § 5-1101(d)(2).

In her opposition to the City's motion for summary judgment, Ms. Wallace argued that the Recreational Use Statute did not apply because its definition of "Land" did not include the Inner Harbor promenade. Ms. Wallace argued that the Inner Harbor promenade was not a "private way" or a "path." Further, she contended that if the City's assertion that

---

10

it specifically made the promenade available for recreational biking as part of its Bicycle Master Plan.

The City further argues that Ms. Wallace's subjective purpose for entering the Inner Harbor promenade is irrelevant to the statutory analysis, arguing that the "[Recreational Use Statute] immunity applies to any land made available for recreational use without charge." Otherwise, the City argues, "two individuals engaged in the same activity would be owed different standards of care[,]" an interpretation that renders the Recreational Use Statute "completely unworkable and [in] conflict" with its purpose. Some examples: (1) one person fishes for fun; the other for food; (2) one plays field sports for fun; the other for cardiovascular health; and (3) one person bikes or walks for fun; the other bikes or walks to get from point A to point B. The City argues that even if subjective intent were relevant, Ms. Wallace was objectively and subjectively engaged in recreational activity, as she testified that she biked for her enjoyment and exercise.

The City also contends that the Recreational Use Statute protections operate independently from common law governmental immunity, and that the Appellate Court

---

the Inner Harbor promenade was made available to the public by the City for recreational purposes was accepted, then the Inner Harbor promenade must be excluded from the definition of "Land" pursuant to subsection 5-1101(d)(2) of the Natural Resources Article, as it was a "structure . . . provided by a local government for the purpose of public recreation." Ms. Wallace's counsel reiterated this argument at the summary judgment hearing. In response, counsel for the City argued that the Inner Harbor promenade was not a structure and stated that "[t]he idea that somehow this doesn't meet the definition of land in the [Recreational Use Statute], quite frankly, is really disingenuous and absurd."

The issue of whether the Inner Harbor promenade met the definition of "Land" in the Recreational Use Statute was not raised on appeal, and thus, we will not address that question here.

mistakenly equated the two. Relying on section 5-1105.1 of the Natural Resources Article, the City notes that the statute's protections are "in addition to" any immunity already available to local governments. The City argues that there are circumstances where the Recreational Use Statute would apply but governmental immunity would not, and vice versa. For example, governmental immunity could apply when minimal fees are charged, but the Recreational Use Statute explicitly does not.

And finally, the City contends that the Appellate Court misapplied *Haley*. As the City sees it, unlike in *Haley*, where the Court was determining the applicability of common law immunity, it makes no difference to the application of the Recreational Use Statute that the Inner Harbor promenade was used for both recreational and transportation purposes: All that matters is that the Inner Harbor Park was charter-designated for the public's recreational use. The City argues that to the extent the City would not be immune from liability under *Haley* due to the mixed use of the Inner Harbor promenade, the Recreational Use Statute superseded *Haley*. The City contends the Appellate Court erred by expanding *Haley* beyond its narrow holding and by reading limitations into the Recreational Use Statute found nowhere in its text. It maintains that the statute provides broader immunity than the common law and should be applied according to its plain language, which contains no exception for thoroughfares or "public connectors" within recreational areas.

## IV

## A

Although enacted in 1966, the Recreational Use Statute has received limited judicial interpretation. *See Martinez*, 245 Md. App. at 591. The General Assembly based the statute on the model act drafted by the Council of State Governments (the "Council") in 1965, *id.* at 592, and adopted in "various forms in dozens of states[.]" *Id.* at 584. The Council explained the public benefits of exempting private property owners from traditional premises liability duties, noting that "[t]he acquisition and operation of outdoor recreational facilities by governmental units [was] on the increase[,]" and that "large acreages of private land could add to the outdoor recreation resources available." *Fagerhus v. Host Marriott Corp.*, 143 Md. App. 525, 538 (2002) (quoting 24 Council of State Governments, *Suggested State Legislation, Public Recreation on Private Lands: Limitations on Liability* 150 (1965) ("*Suggested State Legislation*")). The Council reasoned that "in those instances where private owners are willing to make their land available to members of the general public without charge, it is possible to argue that every reasonable encouragement should be given to them." *Suggested State Legislation* at 150.

The Recreational Use Statute was amended in 2000 to explicitly apply to local governments through the addition of section 5-1105.1.[2] This amendment provided that the statute's liability protections shall apply "to a unit of local government as an owner of land" and clarified that these protections were "[i]n addition to any other common law or

_____

[2] In this analysis, we are using the version of the Recreational Use Statute that was applicable in 2018, at the time of Ms. Wallace's accident.

13

statutory defenses and immunities available to a unit of local government[.]"[3] NR § 5-1105.1; *see also* 2000 Md. Laws ch. 352.

Turning now to the statute's provisions most relevant to the City's position, the statute's purpose is expressed in subsection 5-1102(a):[4]

> The purpose of this subtitle is to encourage any owner of land to make land, water, and airspace above the land and water areas available to the public for any recreational and educational purpose by limiting the owner's liability toward any person who enters on land, water, and airspace above the land and water areas for these purposes.

The first liability-limiting provision is section 5-1103:

> Except as specifically recognized by or provided in § 5-1106 of this subtitle, an owner of land owes no duty of care to keep the premises safe for entry or use by others for any recreational or educational purpose, or to give any warning of a dangerous condition, use, structure, or activity on the premises to any person who enters on the land for these purposes.

The second liability-limiting provision is section 5-1104:

> Except as specifically recognized by or provided in § 5-1106 of this subtitle, an owner of land who either directly or indirectly invites or permits without charge persons to use the property for any recreational or educational purpose or to cut firewood for personal use does not by this action: (1) Extend any

---

[3] Beyond the 2000 amendment extending coverage to local governments, the General Assembly amended the Recreational Use Statute numerous times since 1966. Those amendments addressed various aspects, including expanding the definition of "Land" to include "paths" and "trails," 2000 Md. Laws ch. 352, modifying provisions related to hunting, 1996 Md. Laws ch. 454; 2012 Md. Laws ch. 33, and adding specific exemptions and clarifications, 1973 Md. Laws ch. 4; 1988 Md. Laws ch. 692. While these amendments are not implicated here, as this matter involves a recreational activity that has been within the statute's scope since its original enactment, these amendments demonstrate the General Assembly's continuing attention to and refinement of the statute's application over the decades.

[4] The "Purpose of Subtitle" was expressed in subsection 5-1102(a) of the Natural Resources Article in the 2018 version of the Recreational Use Statute. In 2023, it was moved to subsection 5-1102(b) without any substantive changes.

14

assurance that the premises are safe for any purpose; (2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed; or (3) Assume responsibility for or incur liability as a result of any injury to the person or property caused by an act of omission of the person.

And when the protections of either 5-1103 or 5-1104 are triggered, the exception found in section 5-1106 applies:[5]

The provisions of this subtitle do not limit in any way any liability which otherwise exists for willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity; or for injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational or educational use. However, if land is leased to the State or any of its political subdivisions, any consideration the owner receives for the lease is not a charge within the meaning of this section.

At the outset, there is no doubt that the City's position has in its favor some support in the text of the Recreational Use Statute. *See Comm'r of Fin. Regul. v. Brown, Brown, & Brown, P.C.*, 449 Md. 345, 360 (2016) ("Any effort at statutory interpretation begins with the text of the statute."). By its terms, section 5-1103 purports to eliminate an owner's duties—except those identified in section 5-1106—to members of the public who use the owner's property for "any recreational purpose[.]" Similarly, section 5-1104 protects an owner who "invites or permits" members of the public to use the property for "any recreational" purpose without incurring the common law duties that would otherwise attach. Thus, when the City states that: (1) "[the statute's] immunity applies to any land made available for recreational use without charge[,]" and (2) "[i]f a landowner makes their land available, nothing more is required to invoke the protections it provides from common

_____

[5] In 2022, this section was split into two subsections. No substantive changes were made.

15

law premises liability[,]" it can point to specific language which, viewed in isolation from the express purpose clause, lends weight to its position.

We cannot, however, overlook the ramifications of the City's interpretation. *First*, read in isolation, the last phrase of section 5-1103, which negates the owner's duties "to any person who enters on the land for these purposes" could be plausibly read to make relevant the user's subjective purpose for entering the property. We agree with the City that the applicability of the statute should not depend on, for example, whether the bicyclist was riding for fun or for business purposes. In other words, that Ms. Wallace was riding her bike on the promenade was the relevant fact, not why she was doing so. So, if we were to adopt the City's strict and isolated reading of section 5-1103, we would be constrained to agree with the circuit court that because Ms. Wallace was commuting from work, the statute is inapplicable. The interpretation we adopt below takes a user's subjective purpose out of the equation.

*Second*, as the circuit court observed, the City's interpretation would "yield an absurd result" because "the City would be absolutely immune from suit filed by anyone injured while bicycling or jogging on a city street." In other words, under the City's interpretation, if the promenade is covered by the statute simply because it was made available for public recreational use, the same could be said for all City streets that are available to bicyclists, thus completely vitiating the City's common law duties for maintaining its streets.

The City does not dispute that the consistent application of its logic would produce such results, nor does it contest that such a result would be contrary to the statute's express

16

purpose. Instead, the City tries to assure us that such a result would never happen. It explains that it "has not argued that common streets and sidewalks are subject to [the statute's] protections[.]" But such restraint is unremarkable—the accident occurred on a brick promenade within the Inner Harbor Park, not on a city street. Although the City had no reason to advance such an argument here, nothing would prevent it or other local governments from doing so in future cases.

The City also speculates that courts would undoubtedly face such arguments with skepticism. But, of course, if we adopted the City's interpretation, courts would be bound by our decision regardless of their skepticism. Our task is to interpret statutes, whenever possible, to *avoid* absurd results in the first instance, not to adopt an interpretation that we anticipate could produce absurd results while hoping courts would disregard our holding when that happens. *Lockshin v. Semsker*, 412 Md. 257, 276 (2010) ("In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense."). Nor should we adopt an interpretation that would enable the City to reduce its risk on all its properties by simply opening them up for recreational purposes, regardless of the risks to those who would enter the properties. So, if there is a better path to take—one that remains grounded in the statutory text and avoids absurd results—we should take it.

**B**

The Appellate Court faced a similar interpretive challenge of the Recreational Use Statute in *Martinez v. Ross*. There, the Appellate Court addressed whether the statute barred a claim by an invited social guest—a licensee by invitation—who was injured while riding

17

an all-terrain vehicle on the landowner's private property during a social gathering. 245 Md. App. at 585-86.

The landowner contended that the plain language of sections 5-1103 and 5-1104 immunized him from liability because the guest was using the property for a recreational purpose. *Id.* at 586. He focused on the broad, unqualified language of the operative provisions of the Recreational Use Statute. *Id.* at 590. Specifically, he emphasized that section 5-1103 limits an owner's liability to "keep the premises safe for entry or use by others for any recreational or educational purpose," and that section 5-1104 states that an owner who "invites or permits without charge persons to use the property for any recreational or educational purpose" does not assume responsibility for injuries. *Id.* at 588-89. The landowner argued that nothing in these provisions limited their application to members of the public, and, therefore, the statute's liability protections should extend to injuries suffered by social guests engaged in recreational activities. *Id.* at 594. In contrast, the plaintiff maintained that those sections applied only when the land was made available to the public. *Id.* at 590.

The court identified what it characterized as a "drafting problem" in the model act upon which the Recreational Use Statute is based. *Id.* at 584-85. It explained that "the operative portions of the statute can be read to limit the owner's tort liability to anyone who enters the land for recreational or educational purposes, including the owner's social guests, and not just members of the general public." *Id.* And it concluded that such an interpretation would lead to an overly broad application of the statute that would "nullify the law of premises liability as it pertains to invitees[,]" since "[a]ny time an individual is

18

invited to use an owner's back yard for croquet, immunity would apply." *Id.* at 594 (quoting

*Conant v. Stroup*, 51 P.3d 1263, 1267 (Or. Ct. App. 2002)).

To resolve this challenge, the court surveyed decisions from other jurisdictions that had confronted the same issue. The court noted that "[t]he response of the state courts who addressed the problem has been uniform[,]" with courts consistently interpreting recreational use statutes "to effectuate [their] purpose by concluding that permission to 'any person' refers to any person *as a member of the general public* to use private property for recreational purposes." *Id.* at 594-95 (quoting *Conant*, 51 P.3d at 1267). The court cited numerous authorities from other states holding that recreational use statutes apply only when landowners open their property to the public generally, not merely to social guests. *Id.* at 595-97.

The court then turned to the purpose provision of the Recreational Use Statute, section 5-1102, which states that the statute's purpose is "to encourage any owner of land to make land . . . available to the public for any recreational and educational purpose by limiting the owner's liability toward any person who enters on land . . . for these purposes." The court observed that, in section 5-1102, "any person" refers to members of the public, leading the court to conclude that the General Assembly did not intend to abrogate the common law duties owed to social guests. *Id.* at 595, 597. Construing sections 5-1103 and 5-1104 in harmony with section 5-1102, the court held that the reference to "persons" or "others" "must be read to refer to 'persons' or 'others' as members of the general public." *Id.* at 597. In other words, section 5-1102 provided the qualification to "others" and "persons" that was lacking in sections 5-1103 and 5-1104.

## C

Although *Martinez* is not binding on us, we agree with its analysis and follow the same analytical path here. Just as the owner in *Martinez* argued for an unqualified interpretation of "others" and "persons," the City here argues for an unqualified interpretation of "land" that would include *any* land where recreational activities are permitted. But, as in *Martinez*, section 5-1102 provides the qualification absent in sections 5-1103 and 5-1104. The Recreational Use Statute's purpose, as stated in section 5-1102, "to encourage any owner of land to make land . . . available to the public for any recreational . . . purpose[,]" indicates that the statute protects landowners who voluntarily open land to the public for recreation—land that would otherwise remain unavailable for such uses. The word "land" as used in the phrase "owner of land" in both sections 5-1103 and 5-1104 should be understood and applied in that context. *See Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024) (explaining that statutory text should be interpreted "within the context of the statutory scheme to which it belongs" (quoting *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 169 (2021))).

Viewing the statute in this manner preserves the City's liability for public ways while furthering the statute's intended purpose of encouraging voluntary openings of land—both privately and publicly owned—for recreational purposes. In addition, under this approach, the applicability of the Recreational Use Statute would depend on *what* the user was doing on the property, but not *why* she was doing it.

Applying the foregoing principles here, we hold that the Recreational Use Statute does not protect local governments from common law liability when the government has

made property available for transportation purposes as part of its public infrastructure, even when a permitted use within that transportation infrastructure—such as biking—also constitutes a recreational activity.[6] This is not to say that a formal incorporation of the property into the transportation infrastructure is the only way a local government could render the Recreational Use Statute inapplicable. But because it did so here, the City established a right of access independent from any recreational invitation, and thus assumed the corresponding common law duties associated with that right. The Recreational Use Statute, therefore, does not apply here.[7]

---

[6] The City relies on *Ali v. City of Boston*, 804 N.E.2d 927 (Mass. 2004). There, the plaintiff was injured while riding his bicycle on a path through Franklin Park on his way home after making a purchase at a nearby store. *Id.* at 928-29. The court held that the City was immune under Massachusetts's recreational use statute because the City permitted the public to enter Franklin Park to partake in recreational activities, rejecting the plaintiff's argument to take his subjective intent into account. *Id.* at 931-32. However, the court's opinion in *Ali* does not indicate that the City of Boston incorporated Franklin Park's path into its transportation infrastructure, as did the City of Baltimore here. The distinct nature of the Inner Harbor promenade as compared to Franklin Park makes *Ali* inapposite here.

[7] Our analysis is not inconsistent with that of the Appellate Court, including our interpretation and application of *Haley*. The Appellate Court concluded that the General Assembly did not intend to abrogate *Haley* when it amended the Recreational Use Statute to make it applicable to local governments. *Wallace*, 260 Md. App. at 414-15. The Appellate Court relied on the principle established in *Haley* that the use of a public facility, not its location, is paramount to the analysis. *Id.* at 410. And the Appellate Court relied on *Haley* for the proposition that the maintenance of public highways and roads is a corporate function and therefore, the City was not immune for its negligent performance of that obligation. *Id.* at 407-09. These principles animate our decision as well.

But we disagree with the Appellate Court's analysis in one respect that does not affect the outcome. The Appellate Court correctly determined that the promenade "serves as a public connector to other parts of the City." *Id.* at 410. The Appellate Court went on to state that the promenade "does not serve as a property, park or land that was made available for recreational purposes." *Id.* We disagree. The record establishes that the promenade was available for both transportation *and* recreational uses.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

---

The City expressed a concern that denying the statute's protection here means that the statute would never apply to any park with paths or walkways that are used for recreational and transportation purposes. We disagree. As in most cases, it would depend on the facts. Here, the City was denied the statute's protection not because the promenade *happens* to be used as a public connector; but because the City took affirmative measures to incorporate the promenade into a transportation system that permits bicycling. Whether, in another case, a local government's actions render the statute inapplicable will depend on the facts.

Circuit Court for Baltimore City
Case No. 24-C-19-004548
Argued: November 8, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 12

September Term, 2024

_____

MAYOR AND CITY COUNCIL
OF BALTIMORE

v.

JAMIE WALLACE

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Concurring Opinion by Biran, J.

_____

Filed: July 17, 2025

I am pleased to join the well-reasoned opinion of the Court. I agree that Baltimore City's decision to incorporate the Inner Harbor promenade into its Bicycle Master Plan, and thereby, into the City's public infrastructure, dooms the City's appeal here. As the Court explains, the Maryland Recreational Use Statute (the "Recreational Use Statute"), Md. Code Ann., Nat. Res. ("NR") §§ 5-1101 *et seq.* (1973, 2023 Repl. Vol.), does not protect local governments from common law liability when the government has made property available for transportation purposes as part of its public infrastructure.

But what if the City were to repeal its Bicycle Master Plan or remove the Inner Harbor promenade from that Plan, and the City then raised the Recreational Use Statute as a defense to a claim involving an injury like the one that Jamie Wallace suffered in this case? In that event, a trier of fact would have to consider the applicability of the Recreational Use Statute to a claim involving a landowner's failure to maintain a park pathway that is used both for recreational and non-recreational purposes.[1] Many parks contain such mixed-use areas. I agree with the Court's observations that "a formal incorporation of the property into the transportation infrastructure is [not] the only way a local government could render the Recreational Use Statute inapplicable" and that "[w]hether, in another case, a local government's actions render the statute inapplicable will depend on the facts." Maj. Op. at 21, 22 n.7. I write separately to explore the

---

[1] The Recreational Use Statute provides immunity in connection with dedication of land for both recreational and educational purposes. *See* NR § 5-1102(a) ("The purpose of this subtitle is to encourage any owner of land to make land, water, and airspace above the land and water areas available to the public for any recreational and educational purpose."). For convenience, I only refer to recreational (or non-recreational) purposes or activities in this opinion.

circumstances in which the Recreational Use Statute may not provide a defense to a tort claim, despite the injury having occurred on land that an owner has dedicated for recreational purposes.

**I**

In some cases that we might imagine, it is clear that a public or private landowner will or will not have a valid defense to liability under the Recreational Use Statute. For example, consider a park that a municipality opens to the public free of charge and expressly dedicates for the playing of softball. A spectator watching a Sunday afternoon softball game in bleachers located in foul territory is injured when a dead tree branch that overhangs the bleachers falls on him. The man claims that the municipality negligently failed to maintain the tree, causing the branch to fall and, therefore, his injury. In that case, it seems clear that the Recreational Use Statute shields the municipality from liability. The municipality "owes no duty of care to keep the premises safe for entry or use" by the man for the recreational purpose of watching softball, or to give him any warning that there may be a risk of a tree limb falling into the bleachers. *See* NR § 5-1103.

Now, let's change the facts of the hypothetical. On his way to watch the softball game, a man rides his bicycle on a two-lane road within the park. The posted speed limit along this road is 25 miles per hour, and several speed bumps are located at various parts of the road. The road runs from the western entrance of the park to the eastern entrance. During the week, the road is often used by commuters as a shortcut between the western and eastern parts of the city. Not seeing a pothole in the road, the man rides his bicycle into the pothole, flies over his handlebars, and is severely injured. The man claims that the

2

municipality negligently failed to maintain and repair the road, causing the accident and his injury. It seems clear that the municipality should not be able to invoke the Recreational Use Statute as a defense where, in essence, it has failed to properly maintain a public road that happens to run through a park.

The outcomes of these two hypotheticals make sense intuitively. But, with a few tweaks to the scenarios, the answers might not be as obvious.

**II**

In my view, a two-part test is necessary to appropriately resolve the range of cases where a defendant raises the Recreational Use Statute as a defense to liability for an injury that occurred on land the defendant had dedicated to the public for recreational use free of charge.

First, the defendant has the burden to demonstrate that the injury occurred in a location within the dedicated land that the defendant intended would be used predominantly for recreational activity. This reflects the statute's purpose "to encourage any owner of land to make land, water, and airspace above the land and water areas available to the public *for any recreational and educational purpose*[.]" NR § 5-1102(a) (emphasis added). The focus on the landowner's intent is confirmed by the plain language of the liability-limiting provisions. *See id.* § 5-1103 ("[A]n owner of land owes no duty of care to keep the premises safe for entry or use by others *for any recreational or educational purpose*[.]") (emphasis added); *id.* § 5-1104 (stating that "an owner of land who either *directly or indirectly invites or permits without charge persons to use the property for any recreational or educational purpose*" enjoys specific civil liability protections) (emphasis

3

added). The General Assembly's focus on the purposes for which the landowner opens their land points to the landowner's intent as the controlling indicator for determining liability protection under the Recreational Use Statute.

Second, if the defendant meets this burden, the burden shifts to the plaintiff to show that the defendant had actual or constructive knowledge at the time of the injury that a substantial use of that location was for non-recreational activity. When a landowner is on notice that their intent that the land be used for recreational activity is being undermined, a failure to act may demonstrate that the land is no longer intended to be used for such purposes. This prong again reflects the statute's plain language and purpose: to extend certain civil liability protections to landowners who "make" their land available to the public "for any recreational … purpose." *Id.* § 5-1102(a). If the plaintiff meets their burden under the second part of the test, the owner is not shielded from liability by the Recreational Use Statute.

## A

The first part of my proposed test considers whether the owner of the property intended that the location where the injury occurred would predominantly be used for recreational purposes. Instead of the subjective intent of the land user, the focus is on the intent of the landowner in opening the portion of the land where the injury occurred. The owner has the burden of proof at this first stage. If the owner fails to meet this burden, then the inquiry ends and the defense under the Recreational Use Statute fails.

This part of the test accounts for the reality that some parks have both recreational and non-recreational areas. A park containing softball fields also might have a concession

4

stand where players and spectators may purchase food and beverages. A park may contain hiking and mountain biking trails that are accessible only by driving or biking along roadways within the park and then traversing a parking lot. In my view, the General Assembly did not intend to confer immunity on a landowner for those specific portions of land – notwithstanding its availability to the public free of charge – that the owner does not intend to be used for recreational purposes. If that were not the case, governments could designate all government-owned roads as parkland open to the public free of charge, and claim immunity under the Recreational Use Statute whenever anyone sued for an injury that occurred on such a roadway. That cannot possibly be what the General Assembly intended in enacting the Recreational Use Statute. *See* Maj. Op. at 16-17. But, similarly, I do not believe the General Assembly intended that a landowner would necessarily forgo immunity under the Recreational Use Statute for injuries occurring in those discrete areas it intended to be used predominantly for recreational purposes by opening up other discrete areas within a park for non-recreational activity.

To see how this part of the test would work, let's apply it to the two hypotheticals I posed above, as well as to Ms. Wallace's claim.

*Tree branch falls on the softball bleachers*. The municipality likely would meet its burden to prove that it intended the location where the injury occurred to be used predominantly for recreational purposes. The injury occurred on a softball field that the

5

municipality laid out in a park that it expressly dedicated for the purpose of providing a venue for softball.[2]

*Cyclist injured after hitting a pothole in the road*. The municipality likely would not meet its burden to prove that it intended the location where the injury occurred to be used predominantly for recreational purposes. Although the road could be used by some people for recreational purposes (*e.g.*, recreational bike riding), it seems unlikely that a trier of fact would find that the municipality intended the road itself to be used *predominantly* for recreational purposes. Thus, the defense of immunity under the Recreational Use Statute likely would fail at this first part of the test.

*Ms. Wallace's claim.* We likely would need more facts to know whether the City intended the Inner Harbor promenade to be used predominantly for recreational purposes. It is at least theoretically possible that, notwithstanding the City's incorporation of the Inner Harbor promenade into the Bicycle Master Plan, the City intended that the public would use the Inner Harbor promenade predominantly for recreational activity. For present purposes, I will assume that the City would meet the first part of my proposed test.

---

[2] I agree with the Court's observation that the applicability of the Recreational Use Statute does not depend on a plaintiff's subjective intent in engaging in a particular activity. *See* Maj. Op. at 20-21 (explaining that the applicability of the Recreational Use Statute depends "on *what* the user was doing on the property, but not *why* she was doing it"). I would put an even finer point on it: it matters *where* the land user was doing what she was doing. Imagine that, in my first hypothetical, two people were injured by the tree branch: the spectator and a vendor who had gone into the stands to sell beverages to spectators. The landowner's duty to maintain the tree should not depend on whether a particular plaintiff was engaged in what was, even objectively, recreational or non-recreational activity. Whether the landowner was on notice that vendors were regularly selling beverages in the stands would be relevant to the second part of my proposed test. *See* page 7 below.

## B

The second part of the test considers whether the owner of the property had actual or constructive knowledge that, despite the owner's intended recreational use for the location where the injury occurred, a substantial use of the land at that location was non-recreational. The plaintiff has the burden of proof at this stage. If the plaintiff meets their burden, then the landowner's defense under the Recreational Use Statute fails. Conversely, if the plaintiff does not prove that the defendant had actual or constructive knowledge of a substantial non-recreational use of the land at the location of the injury, then the defendant is entitled to immunity under the Recreational Use Statute.

Let's apply this part of the test to the two above scenarios that survived the first part of the test:

*Tree branch falls on the softball bleachers*. On the facts as I initially presented them, the spectator likely would not meet his burden to prove that the municipality had actual or constructive notice that there was a substantial non-recreational use of the softball bleachers. The facts simply were that he was watching a softball game in the bleachers in foul territory when the tree branch fell on him. But, what if the City had actual knowledge that vendors were regularly selling beverages to spectators in those stands? Perhaps the City gave a company the right to sell food and beverages in various parts of the park. If we add those facts to the scenario, perhaps the spectator could meet his burden to show that the City had actual or constructive knowledge of a substantial non-recreational use at the location of the injury. That would be for the trier of fact to decide. In this context, proof of the defendant's actual or constructive knowledge is important. If a landowner has no reason

7

to know that, contrary to their intent, a particular location within a park is being used, in substantial part, for a non-recreational purpose, the landowner has no reason to take steps to put a stop to such non-recreational activity.

In addition, the non-recreational use must be substantial. If, on one occasion months earlier, a City official had observed two children setting up an unauthorized lemonade stand next to the bleachers and did not tell the children to cease and desist, the City should arguably not be liable for failing to maintain the tree. It would be for the trier of fact to determine what constitutes a "substantial" non-recreational use.

*Ms. Wallace's claim.* Given the City's incorporation of the Inner Harbor promenade into the Bicycle Master Plan, Ms. Wallace would be able to meet her burden to show that the City had actual or constructive knowledge of a substantial non-recreational use of the Inner Harbor promenade. This showing would defeat the City's defense under the Recreational Use Statute. Thus, under my proposed test, Ms. Wallace's case would turn out the same way as the Court decides today.[3]

---

[3] If the City were to remove the Inner Harbor promenade from the Bicycle Master Plan, a plaintiff could nevertheless defeat the City's claim of immunity under the Recreational Use Statute by showing that the City had actual or constructive knowledge that the portion of the Inner Harbor promenade where the plaintiff's injury occurred was used, in substantial part, for commuting or for another non-recreational purpose.